**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **TRENWICK AMERICA REINSURANCE** ) | |
| **CORPORATION and UNUM LIFE** ) | |
| **INSURANCE COMPANY OF AMERICA,** ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civ. Action No. 07cv12160-NG** |
| ) | |
| **IRC, INC. (individually and as successor by** ) | |
| **merger of IRC, INC. and OCCUPATIONAL** ) | |
| **HEALTH UNDERWRITERS, INC.), IRC** ) | |
| **RE LIMITED (individually and as successor** ) | |
| **by merger of IRC RE, LIMITED and** ) | |
| **MANAGED COMPENSATION INSURANCE** ) | |
| **CO. LTD.), and MALCOLM C. SWASEY,** ) | |
| **Defendants.** ) | |

**GERTNER, D.J.:**

**TABLE OF CONTENTS**

**MEMORANDUM AND ORDER**
February 16, 2011

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

II.   FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
      A.   The Hanover Compcare 2000 Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-
      B.   Background of the Reliance Compcare 2000 Program . . . . . . . . . . . . . . . . . . -6-
      C.   Disavowal of the Trenwick-IRC Re Contract . . . . . . . . . . . . . . . . . . . . . . . . . -7-
           1.   Attempts to Collect IRC Re's Alleged Outstanding Balances Relative to
                the Reliance Compcare 2000 Program . . . . . . . . . . . . . . . . . . . . . . . . . -7-
           2.   IRC Re's and Swasey's Disavowal of the Contract . . . . . . . . . . . . . . . -10-
      D.   The Evidence of a Contract Is Overwhelming . . . . . . . . . . . . . . . . . . . . . . . . -11-
           1.   Admissions and Testimony of the Participants . . . . . . . . . . . . . . . . . . -11-
           2.   Swasey's Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-
           3.   Trial Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
      E.   Defendants' Position That There Was Merely an Agreement to Agree Is Not
           Remotely Credible . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

III.  CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-
      A.   Defendants Have Waived Their Right to Claim That Trenwick or UNUM Are Not
           the Proper Plaintiffs in this Suit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-
      B.   The "Follow the Fortune" Doctrine Applies to the Case at Bar . . . . . . . . . . -27-
           1.   The "Follow the Fortunes" Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . -28-
           2.   Application of "Follow the Fortunes" to the Case at Bar . . . . . . . . . . -29-

|  |  | 3. | The Case Law ........................................... | -29- |
|  |  | 4. | Expert Testimony that "Follow the Fortunes" is Custom in the Reinsurance ..................................... | -31- |
|  | C. | | The Defendants Have Waived Their Right to Demand Arbitration ........ | -32- |
|  | D. | | The Statute of Frauds Does Not Bar Plaintiffs' Breach of Contract Claim ... | -34- |
|  |  | 1. | Standard of Review ....................................... | -34- |
|  |  | 2. | Application of the Statute of Frauds to Reinsurance Contracts ...... | -35- |
|  |  | 3. | Trustmark Insurance Company Case .......................... | -36- |
|  |  | 4. | The Statute of Frauds Writing Requirement is Satisfied .......... | -37- |
|  | E. | | There Is Not Enough Evidence to Support a Finding of Fraud or Negligent Misrepresentation Against All Defendants .......................... | -38- |
|  | F. | | Piercing the Corporate Veil ..................................... | -40- |
|  |  | 1. | Massachusetts Law Applies to Plaintiffs' Veil-Piercing Claims ..... | -40- |
|  | G. | | Chapter 93A Liability ........................................ | -45- |
|  |  | 1. | IRC Re ................................................ | -47- |
|  |  | 2. | Malcolm Swasey ........................................ | -47- |
|  |  | 3. | IRC, Inc. .............................................. | -48- |
| IV. | DAMAGES | | ................................................ | -53- |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **TRENWICK AMERICA REINSURANCE CORPORATION and UNUM LIFE INSURANCE COMPANY OF AMERICA,**     Plaintiffs,<br><br>      **v.**<br><br>**IRC, INC. (individually and as successor by merger of IRC, INC. and OCCUPATIONAL HEALTH UNDERWRITERS, INC.), IRC RE LIMITED (individually and as successor by merger of IRC RE, LIMITED and MANAGED COMPENSATION INSURANCE CO. LTD.), and MALCOLM C. SWASEY,**     Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> )   **Civ. Action No. 07CA12160-NG** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ): |

**GERTNER, D.J.:**

## MEMORANDUM AND ORDER
### February 16, 2011

## I.    INTRODUCTION

Trenwick America Reinsurance Corporation ("Trenwick") and Unum Life Insurance Company of America ("UNUM") are suing IRC, Inc. ("IRC, Inc."), IRC Re, Limited ("IRC Re") and Malcolm Swasey ("Swasey") for fraud and breach of contract in connection with a managed workers' compensation insurance and employers liability insurance program known as Compcare 2000. Compl. ¶ 1 (document#1). The dispute centers on the plaintiffs' claim that IRC Re and Swasey breached a reinsurance contract under which IRC Re was to provide retrocessional coverage for the Compcare 200 program.

While the underlying program, its insurance and reinsurance arrangements were complex, defendant Swasey's fingerprints are all over it. Indeed, he founded all of the defendant companies and their predecessors; in each case, he was the company's ultimate decisionmaker. Swasey created, administered and underwrote the Compcare 2000 program in 1994 through two

separate corporations that he started and controlled.  (Both companies have since merged into defendant IRC, Inc.).  Cifuni Dep. 19:11-12, Jan. 21, 2009; Trial Tr. vol. 8, 140, July 1, 2010. The original arrangement as Swasey envisioned it was as follows: Hanover Insurance Company ("Hanover") was the direct insurer for the Compare 2000 program. Joint Pretrial Mem. 14, Stip. Fact No. 31 (document #95).  Hanover was then reinsured by the American Accident Reinsurance Group ("AARG"). Id. at Stip. Fact No. 32.  A portion of the risk ceded to AARG was in turn retroceded to Managed Compensation Insurance Company, Ltd. ("MCIC"), another entity owned and controlled by Swasey, id. at Stip. Fact No. 33, which then merged with and is now known as IRC Re. Id. at 13, Stip. Fact No. 17.  Swasey continued as CEO of IRC Re and its majority stock holder. Id. at 14, Stip. Fact No. 27, 29. In effect, a Swasey company was at the beginning of the chain, IRC, Inc. which administered the program, and at the end of the chain, IRC Re which participated in reinsuring it.

        In 1996, Swasey changed the direct insurer of the program from Hanover to Reliance National Insurance Company ("Reliance"). Id. at 15, Stip. Fact No. 37.  Swasey procured reinsurance for the Reliance Compcare 2000 program, using a structure similar to what existed under the Hanover program.  This time, plaintiff Trenwick America Reinsurance Corp. ("Trenwick") was to provide reinsurance, Id., at Stip. Fact No. 33, and according to the plaintiffs, 19% of the risk was retroceded to IRC Re ("the Contract").  The latter arrangement is the subject of this lawsuit.

        In early 2006, a dispute arose regarding the existence of a retrocessional agreement between Trenwick and IRC Re.  When Trenwick's agents tried to collect IRC Re's share of the liabilities arising from the Compare 2000 program, IRC Re insisted -- through Swasey and at the

11th hour -- that it would not pay unless a copy of the written contract between Trenwick and IRC Re was produced. Trial Ex. 92, at 2. For the very first time in their dealings, Swasey claimed that if *any* type of agreement existed between IRC Re and Trenwick, it was merely an "agreement to agree." Swasey Dep. 376:13-377:12, 396:19-23, 443:10-15, 501:2-3, 513:6-13, 517:19-20, 524:19-525:13, 541:12-24, Sept. 17, 2008. A reinsurance contract may have been contemplated, he contended, but was never actually prepared. Joint Pretrial Mem. 9.

Plaintiffs insist that there was a contract with IRC Re that it is indeed reflected in the documents, conduct and statements of all the parties, including Swasey, and if there were not, defendants who were charged with managing the program, were negligent for failing to prepare it. Compl. ¶¶ 100-03. [1] Specifically, with respect to IRC Re, plaintiffs sue to recover $4,182,057.52 plus interest in unpaid losses and loss expenses that they claim is due on the Contract. See Trial Ex. 240, at TREN 13683. Since IRC Re apparently does not have the assets to cover the claimed losses, plaintiffs also seek to pierce the corporate veil and recover damages against IRC, Inc. and Swasey. Compl. ¶¶ 116-24.

Finally, plaintiffs seek damages and attorneys fees under Mass. Gen. L. Ch. 93A against all defendants relative to the alleged fraud and negligent misrepresentation, as well as for disavowing the contract in bad faith and engaging in a "moving target" strategy of constantly shifting positions throughout this litigation. Compl. ¶¶ 110-15.

The Court heard nine days of testimony, both through witnesses and depositions, and admitted hundreds of pages of exhibits documenting the reinsurance relationships between

---

[1] Plaintiffs also claim tortious interference with contract for the defendants' actions interfering with and ultimately inducing IRC Re to breach the Contract. Compl. ¶¶ 104-09. They also allege fraud and negligent misrepresentation against IRC, Inc. and Swasey for inducing plaintiffs to join the Compare 2000 program by promising IRC Re's participation, when IRC Re arguably actually never intended to pay its share of any losses. Compl. ¶¶ 87-99.

plaintiffs and all three defendants under both the Hanover and Reliance programs, as well as the corporate relationships between Mr. Swasey, IRC, Inc. and IRC Re.[2]

There were two preliminary matters raised by the defendants at the last minute, ostensibly to keep this Court from addressing the merits of plaintiffs claim. First, the defendants claimed for the first time at trial that Trenwick and UNUM were not proper parties. Rather, SARF was the proper party and since one of the SARF members was a Massachusetts corporation, there was no diversity. As I describe below, that claim was waived by the defendants because it was not raised in a timely fashion. Second, the defendants that any contract between the parties required they arbitrate their claims. This claim was also waived because of timeliness.

I find that a contract did exist between IRC Re and the plaintiffs, and that the contract provided that 19% of the plaintiffs' risk was retroceded to IRC Re. I make this finding notwithstanding the statute of frauds, based on the extensive record before me. I further find that IRC Re cannot escape liability here by raising the defenses that Reliance raised against the initial parties, because the "follow the fortunes" or the "follow the settlements" doctrine applies to the case at bar. This doctrine does not allow a reinsurer to raise defenses that the reinsured has already decided to waive in good faith.

I decline to pierce the corporate veil with respect to the defendants' breach of contract claim against IRC Re; none of the factors for piercing are met in the case at bar.

---

[2] As described below, in addition to the findings of fact and conclusions of law resolving plaintiffs' substantive claims, this memorandum resolves several outstanding motions. The Court **DENIES** plaintiffs' motion in limine to identify adverse inferences to which plaintiffs are entitled pursuant to the March 19, 2009, Sanctions Order (document #103) and **DENIES** plaintiffs' motion in limine to preclude the testimony of defendants' expert witness, Glenn Matias (document #106). The Court also **GRANTS IN PART** and **DENIES IN PART** the motion in limine for rulings on the applicability of the "follow the fortunes" doctrine (document #104), as described in this memorandum.

And because I have found that a contract exists as between IRC Re and the defendants, a contract that has been breached, I do not have to address the other claims against IRC Inc. and Swasey that are predicated upon the failure to execute a written contract.

Nevertheless, neither Swasey nor IRC Inc. escape liability here. All of the defendants violated Chapter 93A in myriad ways. Swasey's conduct and that of the companies he created, controlled and administered, pre-, post- and during litigation was simply outrageous, turning what should have been a routine claim against a reinsurer into a tortuous marathon.

## II.    FINDINGS OF FACT[3]

### A.    The Hanover Compcare 2000 Program

Swasey created the Compcare 2000 program in 1994. He and managed and underwrote the program through IRC, Inc. and Occupational Health Underwriters, Inc. ("OHU"), two companies he founded and controlled. Cifuni Dep. Tr. 19:11-12; Trial Tr. vol. 8, 140. At first, Swasey used Hanover as the direct insurer for the Compcare 2000 program. Joint Pretrial Mem.

---

[3] In their complaint, plaintiffs provide a useful explanation of some of the key reinsurance relationships:

> Under a reinsurance contract, the original insuring entity (the "cedent") transfers (or "cedes") part or all of its risk under its policy or insurance to another entity (the "reinsurer"), along with a share of the premium.

> Reinsurers often further reinsure their obligation, as "retrocedents," to other reinsurers, known as "retrocessionaires."

> Typically, the cedent enters into insurance contracts with its policyholders that provide coverage for losses incurred by the policyholder during the policy period.

> Once a cedent pays a claim to or on behalf of a policyholder, the cedent submits claims to the reinsurer under the terms of the reinsurance contract.

> Once the reinsurer has paid the claim to the cedent, the reinsurer, as retrocedent, then submits claims to the retrocessionaire under the terms of the retrocessional contract.

Compl. ¶¶ 19-20, 22-24.

14.  Hanover provided workers' compensation and employers' liability coverage to employers in Massachusetts and Maine.  Id. at 14-15.  The insurance provided by Hanover was reinsured on a ground-up quota share basis[4] by several entities, including the American Accident Reinsurance Group ("AARG"), a reinsurance pool[5] managed by managing underwriter Duncanson & Holt ("D&H").  Id. at 14.  A fixed portion of the risk ceded to AARG in connection with the Hanover Compcare 2000 program in turn was retroceded to MCIC, a company that Swasey also controlled, which later became IRC Re.  The AARG-MCIC relationship was reflected in two written retrocessional contracts.  Trial Exs. 78-79; Joint Pretrial Mem. 13-14.

**B.    Background of the Reliance Compcare 2000 Program**

On December 1, 1996, Swasey changed the direct insurer of the Compcare 2000 program from Hanover to Reliance. Joint Pretrial Mem. 15.  Reliance and Trenwick then entered into a Workers Compensation Quota Share Reinsurance Agreement and Interests and Liabilities Contract to the Quota Share Agreement, effective December 1, 1996.  Trial Exs. 82-83.  Under this new arrangement, 54% of the risk insured by Reliance in connection with the Reliance Compcare 2000 program was now ceded to Trenwick. Joint Pretrial Mem. 15.

---

[4] A quota share treaty is reinsurance in which the reinsurer (or retrocessionaire) shares proportionately in a part of the ceded insurance premiums and losses. Joint Pretrial Mem. 12, Stip. Fact No. 7.  A ground-up share reinsurance contract provides reinsurance coverage in which losses and premium are shared proportionally from the first dollar of loss.  Trial Tr. vol. 7, 17:3-9, June 30, 2010.

[5] A reinsurance pool is a "pooling of insurance companies taking on risk." Trial Tr. vol. 2, 55:5-6, June 22, 2010.  As an entity legally recognized by the National Association of Insurance Commissioners, a pool can take on risk directly from a ceding company. Id. at 55:6-10.  Usually, a managing underwriter, in this case D&H, has an agreement in place with each pool member to write business and buy retrocessional protection on its behalf. Id. at 55:13-17.

Trenwick in turn retroceded 100% of its risk to UNUM, the fronting company[6] of a reinsurance facility known as the Special Accident Reinsurance Facility ("SARF"), for the period from 1996 through 1999. Trial Tr. vol. 2, 56-57, 118, June 22, 2010.

Both Trenwick and UNUM were represented by D&H and later by AAUL Reinsurance Management Services ("AUL RMS"), D & H's successor. The latter companies were charged with managing the Compcare 2000 program. Joint Pretrial Mem. 16. D&H had authority on behalf of Trenwick to accept the reinsurance ceded to Trenwick under the Reliance Compcare 2000 program, and to further retrocede reinsurance on Trenwick's behalf. Id.

The parties do not dispute the participants' roles and authority in the Reliance Compcare 2000 program roles as they are outlined above. What they disagree about is whether 19% of the risk assumed by Reliance under Compcare 2000 was, in fact, further ceded to MCIC, later IRC Re.

**C.      Disavowal of the Trenwick-IRC Re Contract**

         **1.      Attempts to Collect IRC Re's Alleged Outstanding Balances Relative to the Reliance Compcare 2000 Program**

IRC Re's liabilities, if any, relative to the Compcare 2000 program first became an issue when Tracie Pencak ("Pencak") of AUL RMS, the reinsurance managing company, attempted to collect IRC Re's outstanding balances in 2004 and into 2005. Trial Tr. vol. 2, 7:7-20. In January 2006, Pencak finally contacted Swasey directly to find out why IRC Re's balances had not been paid. Id. at 8:8-13. Pencak and Swasey spent the next six to eight weeks reconciling data; by the

---

[6] A fronting company or "paper company" is a company that uses its contract or "paper" to assume risk, which it then retrocedes to others, here IRC Re. Trial Tr. vol. 2, 57:11-13; Trial Tr. vol. 3, 25:4-8, 25:20-22, June 23, 2010. Although it is unclear whether the reinsurance contract was formally with Trenwick or UNUM Life Insurance Company of America ("UNUM"), it does not matter here. UNUM has assigned any claim it might have against defendants to Trenwick. Trial Ex. 123, at 1. As such, I will refer to the contract as being between Trenwick and IRC Re.

end of these discussions, the parties' numbers relating to what IRC Re owed were still approximately $300,000 apart.  Id. at 9:3-7.  Nevertheless, everything about these negotiations suggests that the participants acted as if there were unquestionably a contract, a contract involving a 19% retrocession.  The only question was the actual amount owed.

On January 18, 2006, Pencak forwarded to Swasey, at his request, a copy of the ceding commission calculation adjustment called for in the Quota Share Agreement between Reliance and Trenwick.  Trial Exs. 83, 197; Trial Tr. vol. 2, 11:17-21.[7]  On January 20, 2006, Pencak wrote to Swasey and indicated that, since she sent the files he requested, he should have everything he needed to reconcile the data and send payment.  Trial Ex. 198.  On January 26, 2006, Swasey emailed back, noting:  "Tracie, we are getting closer."  Trial Ex. 200, at TREN 01752.  While Pencak testified that she understood the statement to mean that IRC Re was "getting closer to making payment," Swasey claimed at trial that he only meant that they were getting closer to resolving the amount that IRC Re owed on the Reliance Compcare 2000 business.  Trial Tr. vol. 2, 26:9; Trial Tr. vol. 9, 92:10-13, July 2, 2010.  In the January 26, 2006, email, Swasey also requested that Pencack send him all of Trenwick's and AUL RMS's retrocessional calculations and offsets representing the total net premium retroceded to IRC Re for all years of the Reliance Compcare 2000 program.  Trial Ex. 200, at TREN 01752.

On January 30, 2006, Pencak again provided Swasey with the requested information in a chart attached to her e-mail.  Id. at TREN 01753.  Indeed, Pencack's chart specifically identified the seven checks representing the premium payments that IRC Re in the amount of approximately $1.2 Million, checks that IRC Re plainly accepted in exchange for its contractual

---

[7] The ceding commission is the "upfront cost associated with producing this business." Trial Tr. vol. 2, 11:23-24.

obligations under the Program.[8] Id.  Her calculations showed that the total amount then due from IRC Re was $2.7 million.  Trial Ex. 200; Trial Tr. vol. 2, 27:13-23.

Pencak testified that no expenses were charged to IRC Re other than the ceding commission that IRC, Inc. established at the outset of the program.  Trial Tr. vol. 2, 27:5-9.  On February 14, 2006, Swasey and IRC, Inc. faxed Pencak documents reflecting what they believed the ceding commission calculations should be for each year of the program.  Trial Ex. 106.  Pencak corrected Swasey's and IRC, Inc.'s calculations, specifically addressing their omission of "boards and bureaus" (a kind of tax assessed on workers' compensation business) on February 16, 2006.  Trial Ex. 201; Trial Tr. vol. 2, 33.  Swasey then requested copies of the claims associated with the Reliance Compcare 2000 program, Trial Ex. 202, and Pencak again complied.  Trial Ex. 203; Trial Tr. vol. 2, 35:18-20.  On February 21, 2006, Swasey sent Pencak a "recalculated" version of the spreadsheet that she had provided to him earlier in their discussions.  Trial Ex. 204.  Swasey's calculations acknowledged that the total due from IRC Re at that time was $2,361,095.30. Id. at TREN 01845.  That day, Pencak sent an e-mail to Swasey identifying what she believed to be the parties' remaining "differences." Trial Ex. 205.

On February 23, 2006, Swasey answered Pencak with his version of the parties' "differences." Trial Ex. 107; Trial Tr. vol. 2, 44-45.  He attached "revised calculation sheets" to his letter, which plainly showed what he understood to be IRC Re's 19% share on the program.  Trial Ex. 107, at IRC 00365; Trial Tr. vol. 9, 95.  Swasey's calculation sheets indicate that $1,930,587 was "due AUL" from IRC Re.  Trial Ex. 107, at IRC00366.

---

[8] Swasey later claimed that these payments were put in a "suspense" account, presumably like an escrow account, a claim then retracted and which in any case, had no basis.

Swasey further noted (in paragraph 7) that payment was subject to proof that "Trenwick, who retroceded to IRC Re" gave AUL negotiating rights on their behalf and that Trenwick adhered to all reporting requirements in the Retrocession Agreement. Trial Ex. 107, at IRC 00358. Swasey admitted on cross-examination that the intention of this paragraph was to tell Pencak that if she satisfied these two requests, IRC Re would pay. Trial Tr. vol. 9, 85. On February 24, 2006, Pencak responded to Exhibit 107 again "clarifying, correcting, and changing" Swasey's calculations and assertions, and confirming that AUL RMS had the necessary authority to collect on Trenwick's behalf. Trial Ex. 206; Trial Tr. vol. 2, 48-49. Pencak -- not unreasonably -- expected that payment would be forthcoming for all uncontested amounts. Trial Tr. vol. 2, 47.

## 2. IRC Re's and Swasey's Disavowal of the Contract

On February 28, 2006, Pencak followed up with Swasey by telephone to ask him where IRC Re's payment was. Trial Tr. vol. 2, 52. Swasey responded that a fax would be coming shortly; suddenly, he refused to speak directly with her any further. Id. That afternoon, Pencak received a fax from Jennifer Baird of Beecher and Carlson Management. Ltd. ("Beecher Carlson"), the company which provided management and administrative services to IRC Re. Swasey Dep. 40:9-42:18. The fax attached a letter from Swasey, in which he conditioned further discussions with Pencak on her producing a written contract between IRC Re and Trenwick relative to Compcare 2000 program, Trial Ex. 92; Swasey Dep. 437:3-6. This was an issue never raised before in Swasey's extended dealings with Pencak. Trial Tr. vol. 2, 53. The explanation was bogus, as I describe below. Swasey never contacted Pencak again. Id. The money was never paid.

On November 5, 2007, plaintiffs' counsel wrote to Swasey demanding payment of $2,618,176.75, which plaintiffs alleged was then due from IRC Re as a retrocessionaire under the Reliance Compcare 2000 program. Joint Pretrial Mem. 17, Stip. Fact No. 51.  Swasey responded -- improbably, to say the least -- that he found it "difficult for any and all of you to claim that we were at risk." Trial Ex. 93, at 2.  In light of the numerous discussions between Swasey and Pencak, discussions about the *amount* that IRC Re owed to plaintiffs and not *whether* anything was owed, the Court finds that this statement, and indeed, the entire course of Swasey's, IRC Inc.'s and IRC Re's dealings with Pencak from January 18, 2006 until March 2006 were plainly in bad faith.

### D.    The Evidence of a Contract Is Overwhelming

#### 1.    Admissions and Testimony of the Participants

At trial, plaintiffs presented a significant amount of evidence to establish the existence of an enforceable 19% retrocessional contract between IRC Re and Trenwick, despite the fact that no formal, written agreement was produced.  The evidence was of two kinds:  First, plaintiffs presented testimony reflecting Swasey's unmistakable intent that IRC Re take on risk during the negotiations to bring Reliance and D&H (later succeeded by AUL RMS) into the program, and the specific amount of that risk, as well as evidence that those parties expressly relied on IRC Re's participation.  Second, plaintiffs presented numerous documents -- other than a formal contract -- which likewise confirm IRC Re's 19% participation.

The testimony of both Reliance and D&H representatives regarding their communications with Swasey, along with Swasey's own testimony, could not be clearer.  Swasey admitted at trial that MCIC/IRC Re "intended" to provide retrocessional coverage in connection

with the program.  Trial Tr. vol. 9, 78:7-15.  He agreed that IRC Re's purpose is "to take risks on programs that IRC, Inc. underwrites." Id. at 73:14-17.  Swasey acknowledged that "barring any problems" 19% would be retroceded to IRC Re. Id. at 41:6-7.  When he approached Reliance about transferring the Compcare 2000 program from Hanover to Reliance, he told them in a April 10, 1996 letter that he wanted to keep the "current risk takers in place," including MCIC, because he "owed it to them." Trial Ex. 110; Swasey Dep. 246:13-247:16.[9]

When speaking with Cecelia Abraham ("Abraham"), a Reliance underwriter, about Reliance's potential participation in the Compcare 2000 program, Swasey informed her that MCIC would have "skin in the game," which he explained meant that the company (MCIC and the IRC Re) would be taking on risk. Abraham Dep. 15:7-13, Jan. 29, 2009.  Abraham testified that MCIC's 19% share was "understood to be part of the deal . . . And it was why the deal was done." Id. at 23:11-13.  She further testified that on October 21, 1996, Swasey attended a meeting to "begin the final round of negotiations" on the program, at which he reiterated that MCIC would "continue to take risk." Id. at 31:18-32:2, 7-16.  On November 21, 1996, shortly before the program was to commence, Abraham sent a draft reinsurance agreement to D&H, on which Swasey was copied, explaining: "Also not attached is the Interest and Liabilities Statement, but it is understood that Munich's share will be 31% and D&H's share will be 54% (with 19% retroceded to MCIC)." Trial Ex. 156.  Swasey never objected, nor did he indicate that he needed signed formal agreements for the program to begin.  Trial Tr. vol. 9, 80:5-8; Abraham

---

[9] An outstanding objection to lines 13-25 of p. 245 of this deposition is overruled.

Dep. 65:19-66:2.[10]  (The objection would have been disingenuous, in any event.  It was his responsibility as agent for IRC Inc. to get the signed agreements.)

I find Abraham's testimony regarding her understanding that IRC Re had taken on the 19% risk to be entirely credible.  At the time of her deposition, Abraham had not had any affiliation with Reliance for some time; neither she nor Reliance is a party in this suit.  She could not have been clearer about her communications with Swasey.  Indeed, she was indignant that Swasey and/or IRC Re had the audacity to claim that IRC Re did not take on risk in this program.  By the end of the trial, I shared that indignation.  Abraham Dep. 188:17-24.[11]

In addition to Abraham, Swasey also spoke with Dennis Luc ("Luc") of D&H about the role that IRC Re would play in the Reliance program.  Trial Tr. vol. 9, 40:20-41:3.  Luc was clear that if Swasey and IRC Re had not participated in the Reliance Compcare 2000 program by taking risk "at the back end," D&H would not have participated.  Luc Dep. 44:11-13, 44:17-24.  While defendants claimed that it was Luc who had taken responsibility for executing a written contract, see Defs.' Post-Trial Br. ¶ 4 (document #146), I find otherwise.  In any event, neither Luc nor anyone else involved in the program assumed that IRC Re's participation was somehow contingent on the finalization of a written agreement.

### 2.      Swasey's Conduct

In addition to making it clear to the other parties in the Reliance Compcare 2000 program that IRC Re would be taking on risk, and the amount, Swasey and IRC Re surely *acted* as if a binding retrocessional agreement existed.  From the inception of the Reliance Compcare 2000

---

[10] An outstanding objection to lines 1-25 on p. 65 of the Abraham deposition is overruled.

[11] An outstanding objection to lines 1-21 on p. 188 of the Abraham deposition is overruled.

program and continuing through the course of this litigation, D&H (and later, AUL RMS) sent quarterly account statements to IRC Re showing ceded premium and losses for each quarter. Trial Ex. 215; see Joint Pretrial Mem. 16, Stipulated Fact No. 50. Losses were offset against premium, and if the amount of ceded premium exceeded losses, D&H issued a check to IRC Re for the amount of the net premium due. If the losses exceeded the premium due to IRC Re, D&H requested payment of the balance.

Defendants concede that IRC Re received premium checks from plaintiffs in the amount of $1,179,601.15 in connection with the Reliance Compcare 2000 program. Joint Pretrial Mem. 16, Stipulated Fact No. 46. These payments were made by seven checks that were included with the quarterly account statements issued by D&H to IRC Re between September 22, 1997, and August 10, 2000. Trial Exs. 113, 124-130.

Moreover, defendants repeatedly acknowledged IRC Re's retrocessional liabilities to plaintiffs, not merely to the other participants in the program, but notably to IRC Re's own auditors and regulators. A few key examples: First, IRC Re posted a $1 million letter of credit ("LOC") expressly to secure its retrocessional obligations under the program. Trial Ex. 153. Initially, IRC Re posted the LOC for the benefit of "Duncanson and Holt, agents for American Accident Reinsurance Group" as security for IRC Re's obligations as a retrocessionaire in connection with the Hanover Compcare 2000 Program. Joint Pretrial Mem. 15, Stip. Fact No. 36; Trial Ex. 150. The beneficiary of the letter of credit was eventually amended to "Duncanson

and Holt, Agents for Special Accident Reinsurance Facility." Joint Pretrial Mem. 16, Stip. Fact No. 47; Trial Ex. 153.[12]

Although Swasey testified that he was only aware that there was a LOC for the AARG facility, Trial Ex. 153; Trial Tr. vol. 9, 50:24-51-1, and was not aware of the amendment changing the beneficiary of the LOC to D&H/SARF, Trial Tr. vol. 9, 52:2-7, on cross-examination, he changed his mind.  He conceded that he "was informed that it had been done," but that he just had not seen the particular amendment document marked as Trial Exhibit 153. Id. at 68:3-15.  Significantly, defendants offered no evidence to suggest that the LOC was posted to secure IRC Re's obligations under any other program, or for some different purpose altogether. Plainly, the LOC evidences IRC Re's participation in the Reliance program.

Second, the Reliance Compcare 2000 program -- which began on December 1, 1996 with an expiration date of December 31, 1997 -- had to be renewed on January 1 of each year. Id. at 126:3-6; Swasey Dep. 387:6-388:12.  In his capacity as representative of IRC, Inc., as "intermediary" for the program, Swasey was involved in the initial 1996 placement, as well as all renewals.  Trial Tr. vol. 9, 61:7-9.  Indeed, he agreed he was "personally involved" at all stages of the process, from 1996 through 1999. Id. at 61:25-62:15.  Defendants provided no convincing explanation for why Swasey would have continuously renewed the program if a key element of the program -- IRC Re's participation -- was somehow contingent on the finalization of a written, retrocessional contract.  There is simply no question that Swasey and defendant companies acted

_____

[12] SARF was not a legally recognized entity capable of taking on its own risk like AARG had under the Hanover Compcare 2000 Program. Trenwick or UNUM, as fronting companies of SARF, arguably retroceded a 19% interest to IRC Re.  The remainder of Trenwick's risk was retroceded to the individual SARF members through UNUM.

as if there was a valid, enforceable agreement by renewing IRC Re's participation as a 19% retrocessionaire year after year, along with the other program participants.

Third, defendants repeatedly requested that D&H confirm IRC Re's 19% participation in the Reliance Compcare 2000 program as a retrocessionaire of D&H or a D&H-managed entity (Trenwick or UNUM) to IRC Re's external auditor, Deloitte and Touche ("Deloitte"). Joint Pretrial Mem. 16, Stipulated Fact No. 45; see Trial Exs. 143, 219. Defendants provided no explanation for why IRC Re asked a third party to confirm the details of a reinsurance contract that it is now claiming did not, in fact, exist. In addition, IRC, Inc. itself provided information directly to Deloitte concerning IRC Re's agreement to participate in the Reliance program as retrocessionaire. Trial Ex. 94; Cifuni Dep. 93:24-94:3. On August 12, 1997, at Swasey's direction, Joseph Cifuni of IRC, Inc. wrote to Robert Shaw of Deloitte attaching various charts showing the flow of activities to MCIC/IRC Re. Trial Ex. 94; Swasey Dep. 441:17-19; Cifuni Dep. 93:24-94:3. This letter admits that MCIC had "agreed to participate in the risk for Reliance National as retrocessionaire of D&H." Trial Ex. 94.

Finally, defendants conceded IRC Re's status as retrocessionaire in a draft Private Placement Memorandum and Business Plan for NESCIC (another company that Swasey considered starting) that was provided to D&H in or around March 1998, Trial Ex. 164, as well as in a revised business plan submitted to the Massachusetts Division of Insurance in August 1998 on behalf of NESCIC. Trial Ex. 165. The NESCIC business plan indicated that the insurance currently written by IRC Re consisted of a book of workers' compensation insurance business "on which [IRC Re] is a nineteen percent quota share partner." Trial Ex. 164, at TREN

06636.  Swasey conceded that this refers to the Reliance Compcare 2000 program.  Swasey Dep. 358:8-359:12.[13]

At his deposition, Swasey equivocated, to say the least.  He testified the statements he made in the business plan were based on the fact that IRC Re had "agreed to agree" to participate as a 19% quota share participant in the Reliance program.  Id. at 372:21-373:2.  The comment, however, rings completely hollow -- as does much of Swasey's testimony.

### 3.      Trial Exhibits

IRC Re's 19% participation in the Reliance Compcare 2000 program is clearly reflected in numerous trial exhibits, including: Joseph Cifuni's October 11, 2001 letter to AUL RMS alleging that a receivable of $566,258 was due to IRC Re in connection with the Reliance Compcare 2000 program, Trial Ex. 100, at 4IRC06127; numerous financial statements audited by Deloitte and in Deloitte's actuarial reserve opinions, e.g., Trial Ex. 17, at 2IRC24775; IRC Re's reserve analyses for 1998 and 2000, prepared by Deloitte, in which the Reliance Compcare 2000 program is described, Trial Ex. 9, at 2IRC01786; Trial Ex. 13, at 2IRC25093; hundreds of underwriting reports generated by OHU/IRC, Inc., Trial Exs. 72, 207; the February 13, 2006, letter of Jennifer Baird (of Beecher Carlson) to the Insurance Division of the Bermuda Monetary Authority acknowledging that IRC Re was the retrocessionaire for certain workers compensation coverage written by IRC, Inc. and insured by Reliance, Trial Ex. 160, which Swasey later conceded and referred to the Reliance Compcare 2000 program, Swasey Dep. 541:3-7; and the report of a joint underwriting review of the Reliance Compcare 2000 program, reflecting MCIC's 19% participation by way of a retrocession through D&H, that was received by Swasey and

---

[13] Objections to lines 22-24 of page 358 of the Swasey deposition are overruled.

others at IRC, Inc. in October 1997 without objection. Trial Ex. 220, at 2IRC00421; Swasey Dep. 499:5-15; Abraham Dep. 105:8-106:16[14]

Further, as described above, in all of the email communications between Swasey and Tracie Pencak, Swasey never asserted that IRC Re did not have a contract with plaintiffs. Trial Tr. vol. 2, 24:12-14. Indeed, in his February 23, 2006 letter to Pencak, he suggested that IRC Re would pay the amount he claimed was due (approximately $1.9 million), subject only to proof of AUL's authority to contract for Trenwick. Trial Ex. 107, at IRC00358.

### E.   Defendants' Position That There Was Merely an Agreement to Agree Is Not Remotely Credible

Defendants responded to the above evidence of a binding, retrocessional contract between IRC Re and Trenwick with the repeated claim that, because the necessary formal terms were never reduced to writing, there was, at most, only an "agreement to agree" between IRC Re and Trenwick. Swasey Dep. 374:2-6, 376:13-377:12, 396:19-23, 443:10-15, 501:2-3, 513:6-13, 517:19-20, 524:19-525:13, 541:12-24. Defendants also contended that because there was merely an "agreement to agree," IRC Re held the $1,179,601.15 of premium payments it had received in a segregated "suspense" account pending the finalization of a written retrocessional contract. Id. at 258:13-259:21.

To the extent that this position rests alone on Swasey's statements, I find it wholly incredible. During his video deposition, Swasey did not sit, dress or generally carry himself in a way to invite this Court to take him seriously or credit his words.[15] And apart from Mr. Swasey's

---

[14] Objection to lines 8-10 on p. 105 of the Abraham deposition are overruled.

[15] He decided to eat snacks during his deposition, at one point almost choking on a donut, and would frequently digress; his counsel had to direct him to answer the questions.

conduct, which raised questions in my mind about his credibility, his testimony was internally contradictory and obviously false.

In fact, on more than one occasion at trial, Swasey *admitted* that he had given misleading or incorrect testimony during his deposition on key issues. As described below, he ultimately admitted that the testimony of IRC Re's Bermuda managers proved that he had to have been wrong about the existence of a "suspense account," in which premium payments from Trenwick were held. While he testified at his deposition that IRC Re could not have booked the plaintiffs' payments as premium because no signed, written retrocessional agreement existed, Id. at 257:16-258:12,[16] IRC Re's 1999 financial statement refers to reinsurance balances relating to the Reliance Compcare 2000 program. Trial Ex. 8, at 4IRC02800, 4IRC02808. After reviewing Exhibit 8, Swasey did an about-face, conceding that he would "have to agree . . . 100 percent" that he was able to "book premium" notwithstanding the fact that he did not have a signed written retrocessional agreement. Trial Tr. vol. 9, 114:19-24. In addition, Elizabeth Durrant of BF&M testified that the premium MCIC/IRC Re received was booked on IRC Re's income statements. Durrant Dep. 56:11-14, 56:17-25, Feb. 26, 2009.

Swasey gave misleading testimony when he testified that he did not know anything about UNUM's or SARF's involvement in the Reliance Compcare 2000 program. Trial Tr. vol. 9, 137:4-7. Indeed, coming from the architect of the program, the comment was preposterous. In his deposition, he acknowledged that with regard to the January 1, 2000 program renewal, Trenwick agreed to remain on the risk subject to a 100% retrocession to UNUM. Swasey Dep. 432:8-20; see Trial Ex. 208, at TREN 5913. As for Swasey's awareness of SARF's involvement,

---

[16] Objections to lines 9-16 on p. 258 of Swasey's deposition are overruled.

plaintiffs' premium checks were sent to IRC Re from D&H's SARF/Trenwick fiduciary account. E.g., Trial Ex. 125. The calculation sheets that Pencak provided to Swasey in February 2006 identifying the amount IRC Re owed at that time, and which were later "recalculated" by Swasey, expressly referred to SARF. Trial Exs. 200, 204.

Finally, there were significant inconsistencies in Swasey's testimony regarding discussions that he had with Luc, A&H's representative, about critical clauses that were to appear in the final written Contract. For example, at his deposition, Swasey testified that he never discussed arbitration clauses with Luc. Swasey Dep. 484:19-485:2. At trial, Swasey he admitted the opposite -- that he discussed with Luc it was "imperative" that IRC, Inc. "as the program manager and the architect of the [program] be involved in any form of arbitration," and that relative to any disagreements, "IRC, Inc. must have a seat at that table." Trial Tr. vol. 9, 42:13-22. When confronted with his inconsistency, Swasey conceded that although he now testified the issue of arbitration was "imperative," he "apparently" did not even remember discussing it with Luc at his deposition. Id. at 65:2-5. Similarly, at his deposition, Swasey never mentioned a discussion of a commutation clause with Luc. While at trial, he claimed the opposite. Id. at 43:21-44:2.

Although Swasey used the phrase "agreement to agree" when referring to the "alleged" contract in this litigation, prior to the litigation, he did not, particularly when discussing the agreement with any of other parties involved in the Reliance Compcare 2000 program. Id. at 86:22-87:3; Swasey Dep. 424:19-25. Cifuni, IRC, Inc.'s CFO, conceded that Swasey never mentioned that IRC Re's participation was contingent on anything, let alone "the execution of an agreement." Cifuni Dep. 92:6-12. Nor did Swasey ever refer to the supposed "agreement to

agree" in his discussions with Pencak until the very last minute, when he decided not to pay. Trial Tr. vol. 2, 32:13-15; 32:10-12; Trial Tr. vol. 9, 92:17-23.  He took no affirmative steps towards memorializing the terms in a legally-binding, written contract himself, or to convey to Luc the fact that D&H needed to resolve the "agreement to agree" in order for it to have binding effect on IRC Re.  Trial Tr. vol. 9, 87:4-9.  Luc testified that "there were no issues" or outstanding terms to be discussed; IRC Re, through Swasey, behaved in all respects as if there were a retrocessional agreement.  Luc Dep.  Tr. at 176: 9-16.

Swasey somehow failed to inform the employees of Beecher Carlson, IRC Re's Bermuda manager and the company that maintained all of IRC Re's financial records, Trial Tr. vol. 8, 113:22-115:3, that there was only an "agreement to agree."  Swasey Dep. 541:12-17.  Nothing in Exhibit 160 (Baird's of Beecher letter to the "Bermuda Monetary Authority"), remotely suggested that Baird believed there was only an "agreement to agree."  Id. at 541:19-24.  Nor did Swasey recall instructing Baird to clarify the status of IRC Re's retrocessional contract on the Reliance Compcare 2000 program to the Bermuda Monetary Authority, even though he admitted that they would "certainly" want to know whether there was a retrocessional agreement as opposed to an "agreement to agree."  Id. at 541:25-542:7-12.

Swasey lied about the status of the approximately $1.2 million of cash premium payments that IRC Re received from plaintiffs. At his deposition, he insisted it was sitting in a "suspense" account.  Id. at 258:13-259:21; Trial Tr. vol. 9, 102:22-24.[17]  Swasey explained that the "suspense" account was significant.  The money in the account was "not his money" because there was only an "agreement to agree."  Trial Tr. vol. 9, 102:2-4.  According to Swasey, "these

_____

[17] Objections to lines 9-16 on p. 258, lines 17-22, lines 23-25 and lines 1-21 on p. 259 of Swasey's depositon are overruled.

monies would not have gone anywhere. These monies don't belong to us, so obviously we're

holding the money." Swasey Dep. 335:6-9. To the best of his knowledge, Swasey contended, the

monies were sitting on deposit at the Bank of Butterfield in Bermuda. Id. at 335:18-25; Trial Tr.

vol. 9, 105:2-3.

Swasey's assertion that the premium monies that IRC Re received from plaintiffs were

somehow segregated or held in a suspense account is simply not supported by any document in

the record, nor by any witnesses. There is no letter or email written to anyone at D&H

suggesting that the premiums were not IRC Re's. Trial Tr. vol. 9, 102:8-14. Nor is there "any

document of any nature whatsoever, including an internal document," that refers to the premium

money as being segregated. Id. at 103:11-14.

None of the individuals who were responsible for handling IRC, Inc.'s or IRC Re's

finances knew anything about the so-called "suspense account." See Baird Dep. 70:22-72:10,

Feb. 25, 2009; Durrant Dep. 57:16-18, 58:15-59:6. In fact, Swasey conceded on cross-

examination that if IRC Re's Bermuda managers never heard of the "suspense" account, it would

suggest that the account does not exist. And then, at last, he confessed: It has been "established

according to BF&M and Beecher & Carlson that there is no such segregated account." Trial Tr.

vol. 9, 104:19-105:1; 106:1-3; 107:2-5.

Nor could Swasey point to any document that reflected the premium monies were in fact

on deposit anywhere at the Bank of Butterfield. Id. at 105:4-22. He testified that it has been a

"long time" since he looked at the bank account statement reflecting the approximately $1.2

million. Id. at 106:9-11. He admitted that the bank account was used for "purposes other than

holding" the premium. Id. at 108:8-10.

In light of the above -- defendants acting as if there was a Contract throughout the duration of the program, Reliance's and D&H's understanding that there was a Contract, the clear documentation of the 19% retrocession, and the fact that defendants never claimed that there was merely an "agreement to agree" until this litigation commenced, I find defendants' contention that there was merely an "agreement to agree" to be, in a word, ludicrous.

## III.    CONCLUSIONS OF LAW

### A.    Defendants Have Waived Their Right to Claim That Trenwick or UNUM Are Not the Proper Plaintiffs in this Suit

Defendants argue, as a preliminary matter, that plaintiffs do not have standing to maintain their contract claims against defendants because any alleged contract would not have been between IRC Re and Trenwick or UNUM, but rather with SARF.  Defs.' Post-Trial Br. 6 (document#146).  Given SARF's status, any claims would have to be brought by SARF's individual members or, alternatively, plaintiffs would have to demonstrate their standing to pursue the claims belonging to SARF.  Id. at 11.  Furthermore, even if plaintiffs could establish standing to bring suit on behalf of SARF, or if each of the individual SARF members collectively brought the action, this Court lacks diversity jurisdiction because one member, John Hancock Life Insurance Company ("John Hancock"), was a citizen of Massachusetts, the same citizenship as Swasey.  Id. (citing Compl. ¶ 17); see also Trial Ex. 170.[18]

Defendants acknowledge that they conceded diversity jurisdiction in their answer.  They claim that the admission was "premised on incomplete jurisdictional facts as pleaded in the

_____

[18] Defendants argue that SARF is an "unincorporated association," and because these associations "are deemed to be citizens of each and every state in which their members are citizens," John Hancock's presence in the case destroys diversity jurisdiction.  Defs.' Post-Trial Br. 11 (citing Lindner Div. Fund v. Ernst & Young, 880 F. Supp. 49, 59 (D. Mass. 1995)).

complaint, which did not specify the citizenship of the remaining SARF members, including John Hancock." Defs.' Post-Trial Br. 11. Moreover, the claim was only raised at the very eve of trial.

Plaintiffs counter that defendants' argument amounts to the claim that Trenwick is not the real party in interest but that SARF is. This claim, they contend, was waived under Rule 17, Fed. R. Civ. Pro. because defendants failed to raise it in a timely fashion. Pls.' Trial Br. 48 (document#120). While plaintiffs admit that the rules do not specify a particular procedure or time, they contend that it should be done with "reasonable promptness" or the court may conclude that "the point has been waived by delay." Id. (citing 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1554 (2d ed. 1990)). I agree. The Rule 17 claim is waived and, in any case, is without merit.

While the question of whether a real party in interest challenge may ever be deemed untimely has never been directly addressed in this jurisdiction, courts elsewhere have overwhelmingly held that a Rule 17 objection is waived if not raised with "reasonable promptness." See, e.g., Hefley v. Jones, 687 F.2d 1383, 1388 (10th Cir. 1982) ("The real party in interest defense . . . should be raised in timely fashion or it may be deemed waived") (citing Audio Visual Mkting Corp. v. Omni Corp., 545 F.2d 715, 719 (10th Cir. 1976)); Esquire Swimming Pool Prod., Inc. v. Pittman, 332 A.2d 128, 130 (R.I. 1975) ("Undue delay in making such a challenge may result in the defendant's being deemed to have waived his right to raise this objection.") (citing 1 Robert Kent, R.I. Civ. Prac. § 17.1 (1969); 6 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1554 (1st ed. 1971)); Whelan v. Abell, 953 F.2d 663, 672 (D.C. Cir. 1992) ("[W]here a Rule 17(a) defense is made, judges abuse their discretion in

allowing the plea as late as the start of the trial. . ."); United Healthcare Corp. v. Am. Trade Ins. Co., Ltd., 88 F.3d 563, 569 (8th Cir. 1996) (objection waived when "not raised in a timely or seasonable fashion") (citing Sun Ref. & Mkting Co. v. Goldstein Oil Co., 801 F.2d 343, 345 (8th Cir. 1986) (quoting Chic. & NW Transp. Co. v. Negus-Sweenie, Inc., 549 F.2d 47, 50 (8th Cir. 1977))); McLouth Steel Corp. v. Mesta Mach. Co., 116 F. Supp. 689, 691 (E.D. Pa. 1953) ("[A]fter two years of procedural maneuvering, the defendants presented their motion four days before the day on which the case was set for trial. . . It is hard to see how a motion could be less timely").

In the most analogous cases, defendants raised Rule 17 objections sixteen days before trial, Hefley, 687 F.2d at 1386, and four days before trial, respectively, McLouth, 116 F. Supp. at 691.  In others, defendants raised their objections on the first day of trial, Whelan v. Abell, 953 F.2d at 668, at the close of plaintiff's case, Gogolin & Stelter v. Karn's Auto Imp., Inc., 886 F.2d 100, 102 (5th Cir. 1989), after default judgment had been entered, Bardoon Prop. v. Eidolon Corp., 485 S.E.2d 371, 371 (S.C. 1997), and on appeal, United Healthcare Corp. 88 F.3d at 568; Negus-Sweenie, Inc., 549 F.2d at 49.  In each instance, the court held the objection to have been waived.

To be sure, some courts have held that the objection can be raised by defendants at any time, or even by the court sua sponte, but those cases are distinguishable.  See Calenda v. Allstate Ins. Co., 518 A.2d 624, 627 (R.I. 1986) (holding that because defendant was never aware of a possible real party in interest objection, "the trial justice could properly raise the issue"); E. Brooke Matlack, Inc. v. Walrath, 24 F.R.D. 263, 267 (D. Md. 1959) (deciding that despite defendant's tardiness in raising a Rule 17 objection, even after the court had brought it to

defendant's attention earlier, the court would not decide the issue on the basis "of waiver of right to insist upon compliance with Rule 17(a)"); Clark v. Hutchison, 161 F. Supp. 35, 38 (D. Canal Zone 1957) (analogizing a real party in interest objection to a Rule 19 motion for failure to join a necessary party, and thus concluding that it could be raised at any time).  First, in E. Brooke Matlack, 24 F.R.D. at 266 and Calenda, 518 A.2d at 627, the courts acknowledged the general rule that a Rule 17 objection could be waived due to excessive delay, even though it found no waiver on the facts of the case before them.[19]  Second, a critical issue in determining when delay is excessive is whether the defendants had enough information to raise the objection at a much earlier point in the proceedings.  See Hefley, 687 F.2d at 1387 ("[Defendant] had the facts before him to assert this defense for a year and a half from the time the complaint was filed"); Pittman, 332 A.2d at 131 ("Nothing in the record suggests that defendants were ignorant of the real party in interest of the actual claims involved").

In the case at bar, IRC Re which was controlled by the program's very architect, Swasey, plainly knew that the members of the SARF facility were UNUM's retrocessionaires on the Reliance Compcare 2000 program.  In any case, defendants surely had ample time to investigate whether the SARF members were the proper plaintiffs between the complaint and trial.[20]

---

[19] Likewise, other cases explicitly state that it is up to the court to determine what constitutes "reasonable promptness."  See Pittman, 332 A.2d 130 ("Whether an objection made to invoke the protection of Rule 17(a) was so unreasonably delayed as to evidence of waiver of the right to object under that rule is a matter within the sound judicial discretion of the trial justice . . ."); see also Wright & Miller, supra, § 1554.

[20] The premium payments made to IRC Re by six of the seven checks that were issued by D&H between September 22, 1997, and August 10, 2000, listed "S.A.R.F./Trenwick America Re Corp." above "Duncanson and Holt" under the maker's name and address.  Trial Exs. 125-130.  In addition, since Swasey himself brought Reliance and D&H into the Compcare 2000 program, and IRC, Inc. performed the duties of a program manager throughout the duration of the program, they should have known or reasonably known who all of the key parties were.

Defendants never amended their answer to include failure to join the real party in interest as a defense, nor file a motion to dismiss under Rule 17. They never made the Rule 17 argument until they filed their pre-trial memoranda, approximately three years after the start of this litigation. In that time, tremendous resources have been expended by both sides on the assumption that Trenwick/UNUM would be the plaintiff. (Indeed, three different judges have presided over this case under the same assumption.)

I find that raising an objection to Trenwick and UNUM as the proper plaintiffs in this suit three years into the proceedings and on the eve of trial constitutes undue delay on defendants' part. They have waived their right to object.[21] (Indeed, this tactic is another version of raising the "no written contract" claim at the eleventh hour to avoid repayment of an acknowledged debt. It is a delaying tactic, putting off the day of reckoning.)

### B. The "Follow the Fortune" Doctrine Applies to the Case at Bar

The unpaid losses that plaintiffs contend are now owed by IRC Re include liabilities on claims that were resolved as part of the settlement of an arbitration between Trenwick and Reliance. Compl. ¶ 68-71. Defendants claim that they may relitigate the defenses that Trenwick raised in its arbitration with Reliance before the settlement in this case. Defs.' Opp'n to Mot. for Default J. 14-15 (document#51).[22] Whether or not defendants may do so depends on a doctrine known as "follow the fortunes" or "follow the settlement." The "follow the fortunes" doctrine

---

[21] Moreover, given SARF's status as a "fronting company," see n. 5, supra, I conclude that it is not the real party in interest here.

[22] For example, in opposing plaintiffs' First Sanctions Motion, defendants argued that the following allegations raised in the arbitration must first be answered in order to determine "what, if anything, is owed" by IRC Re to plaintiffs as a result of the arbitration settlement: that Reliance had not adhered to underwriting guidelines, had not maintained sufficient controls, had written policies in violation of treaty exclusions, had overstated commissions, and had overstated gross premium. See Defs.' Opp'n to Mot. for Default J. 14- 15.

does not allow a reinsurer to raise defenses that the reinsured has already decided to waive in good faith. Christiania Gen. Ins. Corp. of New York v. Great Amer. Ins. Co., 979 F.2d 268, 280 (2d Cir. 1992). As described below, it is not clear whether the doctrine is recognized in Massachusetts, and if so, whether a court can imply it as a matter of law without testimony on custom and practice in the relevant reinsurance industry. Since the status of the doctrine in Massachusetts is ambiguous, out of an abundance of caution I heard testimony concerning industry custom and practice on this point. Based on that testimony, I conclude the doctrine is applicable in the case at bar.

### 1. The "Follow the Fortunes" Doctrine

The "follow the fortunes" doctrine imposes a legal duty on the reinsurer to pay its share of a settlement made by the reinsured with the original parties. William Hoffman, On the Use and Abuse of Custom and Usage in Reinsurance Contracts, 33 Tort & Ins. L.J. 1, 60 (1997). Once the original insurer has been found liable, the doctrine requires the reinsurer to cover the reinsured, unless the reinsurer demonstrates that the original insurer's liability resulted from fraud and collusion, or unless the claim was not reasonably within the scope of the original policy. N. River Ins. Co. v. CIGNA Reins. Co., 52 F.3d 1194, 1209, 1216-17 (3d Cir. 1995). In effect, a reinsurer must accept its cedent's good faith decisions "on all things concerning the underlying insurance terms and claims against the underlying insured." N. River Ins. Co. v. Ace Am. Reins. Co., 361 F.3d 134, 139-140 (2d Cir. 2004).[23]

---

[23] The relevant case law refers not only to the "follow the fortunes" doctrine, but also to the separate, yet related, "follow the settlements" doctrine. Plaintiffs initially chose to use the broader term "follow the fortunes" to refer to both doctrines, in accordance with prior usage by federal courts, and thus, for convenience that is the term that I will use as well. Pl.'s Mem. of Law in Supp. of Mot. in Limine for Rulings on the Applicability of the Follow the Fortunes Doctrine 4 (document#104); Pls.' Post-Trial Br. 25 (document#150); see N. River Ins. Co., 361 F.3d at 139.

The very purpose of the "follow the fortunes" doctrine is to preclude relitigation of coverage disputes. Allowing reinsurers to revisit coverage questions "would place the ceding insurer in an untenable position of advancing defenses in coverage contests that would be used against them by reinsurers seeking to deny coverage." CIGNA, 52 F.3d at 1206. As such, the "follow the fortunes" doctrine prevents reinsurers from subverting two of the main goals of reinsurance -- maximum coverage and settlements. If courts permitted a de novo review of the insurer's decision-making process, cedents would ultimately litigate every coverage issue before making any attempt at settlement. Int'l Surplus Lines Ins. Co. v. Certain Underwriters & Underwriting Syndicates at Lloyd's of London, 868 F. Supp. 917, 921 (S.D. Ohio 1994). As I noted, if a cedent "knew that its settlement decisions could be challenged by every reinsurer, there would be little incentive to settle with the insured." Commercial Union Ins. Co. v. Seven Provinces Ins. Co. Ltd., 9 F. Supp. 2d 49, 66 (D. Mass. 1998), aff'd 217 F. 3d 33 (1st Cir. 2000).

### 2.    Application of "Follow the Fortunes" to the Case at Bar

Plaintiffs argue that the "follow the fortunes" or "follow the settlements" doctrine is "inherent in every reinsurance relationship," even when the parties have not formally expressed it in their agreement. Pl's Mem. of Law in Supp. of Mot. in Limine for Rulings on the Applicability of the Follow the Fortunes Doctrine 8 (citing Robert W. Strain, Reinsurance 12 (1987)). While plaintiffs raised this issue in advance of trial, arguing that the doctrine *must* be implied as a matter of law prior to trial, id. at 2, the law in Massachusetts is unresolved. As such, I permitted testimony on custom and practice in the industry. In light of that testimony, I find that the "follow the fortunes" doctrine applies to this agreement, even in the absence of an express contract.

### 3. The Case Law

In <u>Seven Provinces</u>, on which plaintiffs rely, this Court addressed the scope of the "follow the fortune" doctrine in a situation where the parties had included an explicit contract clause to that effect. 9 F. Supp. 2d at 65-66. Likewise, in <u>Am. Empl. Ins. Co. v. Swiss Reins. Am. Corp.</u>, 275 F. Supp. 2d 29, 36 (D. Mass. 2003), the contract was clear. The parties were not asking the court to resolve whether "follow the fortunes" could be *implied* in reinsurance contracts. <u>Am. Empl. Ins. Co.</u>, 275 F. Supp. 2d at 36.[24] To be sure, the court in <u>Am. Empl. Ins. Co.</u> relied on <u>Aetna Cas. & Sur. Co. v. Home Ins. Co.</u>, 882 F. Supp. 1328, 1349 (S.D.N.Y. 1995), for a broader proposition. The court in <u>Aetna</u> held that "it is customary within the reinsurance industry for reinsurers to follow the claim settlement decisions of the ceding company even in the absence of an explicit loss settlements clause," 882 F. Supp. at 1349. Nevertheless, defendants correctly point out that this decision came only after the court heard testimony from Aetna's expert witness on the existence of industry custom, which the court described as "pivotal." <u>Id.</u> at 1350. Additionally, the court did not state that it was deciding the issue purely as a matter of law, but rather that determining whether the duty to follow loss settlements is an industry custom "is in the first instance a question of fact." <u>Id.</u> at 1349 (citing <u>Mentor Ins. Co. (U.K.) Ltd. v. Brannkasse</u>, 996 F.2d 506, 513 (2d Cir. 1993)); <u>see also</u> <u>N. River Ins. Co. v.</u>

---

[24] In <u>Lexington Ins. Co. v. Prudential Reins. Co. of Am.</u>, No. CA 95-4083-E, 1997 Mass. Super. LEXIS 593, the court again primarily considered the scope of the "follow the fortunes" doctrine. Specifically, the Massachusetts Superior Court considered whether the reinsurer must follow the settlement of the reinsured when the reinsured makes a settlement payment outside the policy, rather than whether the doctrine applied in the absence of explicit language in the reinsurance agreement. <u>Id.</u> at *8. The court limited its discussion to a brief footnote in a section on the nature of reinsurance, and the footnote revealed that the agreements *did* contain a "follow the fortunes" clause. <u>Id.</u> at *7 ("Most reinsurance contracts, like the one in the present case, contain 'follow the fortunes' clauses . . . "). The footnote continues: "Even absent such specific language, the 'follow the fortunes' doctrine generally applies to all reinsurance agreements." <u>Id.</u> (citing Barry Ostranger & Mary Kay Vyskocil, <u>Modern Reinsurance Law and Practice</u> § 9.01 (2d ed. 2000)). Again, this is dicta; with no other Massachusetts case cited.

<u>Employers Reins. Corp.</u>, 197 F. Supp. 2d 972, 978-79 (S.D.Ohio 2002) (citing <u>Nat'l Am. Ins. Co.</u> <u>of Cal. v. Certain Underwriters at Lloyd's London</u>, 93 F.3d 529, 537 (9th Cir. 1996) ("[T]he existence of a custom or usage to 'follow the settlements' is in the first instance a question of fact")).  Furthermore, the court concluded that "the authorities advisedly do not speak with one voice" on whether "follow the fortunes" applies even when it is not expressed in the reinsurance contract.  <u>Aetna</u>, 882 F. Supp. at 1349.  This concession, coupled with the court's reliance on expert testimony, suggests that while plaintiffs in this case may rely on <u>Aetna</u> to argue that custom and usage can empower the court to apply the "follow the fortunes" doctrine in the absence of an explicit clause, it does not support application of the doctrine without expert testimony on industry custom and usage.

### 4.      Expert Testimony that "Follow the Fortunes" is Custom in the Reinsurance Market

Plaintiffs' expert, Steven Mestman, offered persuasive testimony that the "follow the fortunes" doctrine is a customary component of almost every reinsurance agreement.  Trial Tr. vol. 7, 39:21-40:2.  Even defendants' rebuttal expert witness, Glenn Matias, agreed that the "follow the fortunes" doctrine is a core tenet of the reinsurance business.  Trial Tr. vol. 8, 57:20-22.  Both agreed that the doctrine obligates a reinsurer to indemnify the ceding company so long as the underlying insurance payments are made in good faith and within the terms and conditions of the reinsurance agreement.  Trial Tr. vol. 7, 40:3-6; Trial Tr. vol. 8, 69:14-17.  Mestman added that "without question" the "follow the fortunes" doctrine would apply to a contract between the plaintiffs and IRC Re in accordance with industry custom and practice, and in accordance with all of the other agreements in the reinsurance chain.  Trial Tr. vol. 7, 44:22-25; 45:2-6.

In addition to the custom and practice in the industry, Mestman noted that *all* of the other written contracts relative to the Reliance Compcare 2000 program had "follow the settlements" language, which he found particularly persuasive. Even Matias conceded that it would be "extraordinarily unusual" not to see a follow the settlements provision in the Retrocessional Contract with IRC Re in "some way, shape or form." Trial Tr. vol. 8, 69:18-25.

Mestman explained that the rationale for the doctrine is to give assurance to the ceding company when they purchase reinsurance that if they comply with the agreement in a "diligent and fair way" and comply with its conditions, they can "expect to be paid as they pay." Trial Tr. vol. 7, 40:22-41:1. Matias agreed that without "follow the fortunes," the risk transfer mechanism of a reinsurance program would not work. Trial Tr. vol. 8, 70:1-3.

### C.      The Defendants Have Waived Their Right to Demand Arbitration

Defendants also argue that because all of the relevant contracts in the Reliance Compcare Program contained mandatory arbitration clauses, if this Court concludes that an enforceable contract exists between plaintiffs and IRC Re, the doctrine of concurrence[25] would require that the Court imply the same arbitration provision in the retrocessional agreement between plaintiffs and IRC Re. Trial Tr. vol. 7, 24:3-25:18, 61:8-62:23. They also point to the testimony of Dennis Luc that he had never been involved in a risk bearing policy in which there was not an

---

[25] On concurrency, Mestman testified: "[T]his is [] a unique situation . . . .where the IRC entities were involved in virtually every aspect of this transaction, and there was no reason to think under those circumstances that they wouldn't want to follow the settlements of all of those entities . . . .they were involved in all stages of the transaction from the front end to the back end . . . [W]hen you have a situation like that, it would highlight to a greater degree why there should be concurrency and implicit assumption that it would be there, as it appears in all other clauses, and that they would want to honor when they were arranging the reinsurance with Reliance and Trenwick, why they would want to honor those settlements on business which flowed to Reliance from their own agency." Trial Tr. vol. 7, 45:9-13, 45:17-19; 46:3-10. Mestman further noted that 'follow the settlement' would enhance concurrency because "if [the 'follow the settlements' term] appears in the earlier parts of the chain, [] with concurrency, it would be held to be in the back end as well." Id. at 46:13-18.

arbitration provision and Tracie Pencak that she could not recall any reinsurance contract without an arbitration clause.

While there may be some merit to defendants' argument, it is far too late for arbitration after almost three years of litigation, a two-week bench trial, and the related costs incurred by all parties that would have been avoided if arbitration were demanded at the outset. The First Circuit has "repeatedly held that a party may, by engaging in litigation, implicitly waive its contractual right to arbitrate." Navieros Inter-Americanos, S.A. v. M/V Vasilia Exp., 120 F.3d 304, 316 (1st Cir. 1997) (holding that a party waived its right to arbitration where it delayed raising the issue until eve of trial); Restoration Pres. Masonry, Inc. v. Grove Eur. Ltd., 325 F.3d 54, 57, 61-62 (1st Cir. 2003) (after participating in at least five depositions and 13 pre-trial conferences, defendants had waived their right to arbitration).

In their Joint Pretrial Memorandum, defendants first raised the claim that "[i]f there was a contractual relationship involving IRC Re, . . . dismissal [of this Complaint] is warranted by reason of the arbitration provision in the contract." Joint Pretrial Mem. 23 (document #95). The fact that the "enforcement of arbitration [i]s [first] brought up when the trial [i]s near at hand," as it was in this case, weighs heavily in favor of waiver. See Jones Motor Co. v. Chauffeurs, Teamsters & Helpers Local Union No. 633, 671 F.2d 38, 43-44 (1st Cir. 1982) (finding it unfair to "require that parties go to arbitration despite their having advanced so far in court proceedings before seeking arbitration"; district court had rightly found a waiver of arbitration). An arbitration this late in the litigation would mean that the considerable time, energy and resources that the parties and this Court have expended in preparing and trying this case were wasted. See Menorah Ins. Co. v. INX Reins. Corp., 72 F.3d 218, 222 (1st Cir. 1995) (finding that a delay of

15 months was sufficient to waive right to arbitration); <u>Jones Motor Co.</u>, 671 F.2d at 42 (delay of more than one year was sufficient to demonstrate waiver).

### D.    The Statute of Frauds Does Not Bar Plaintiffs' Breach of Contract Claim

#### 1.    Standard of Review

Defendants argue that because the "alleged" contract was a multi-year agreement, it falls within the ambit of, but does not satisfy, the requirements of the Massachusetts Statute of Frauds.  The Massachusetts Statute of Frauds provides:

> No action shall be brought: . . . [u]pon an agreement that is not to be performed within one year from the making thereof . . . [u]nless the promise, contract or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized.

M.G.L.A. ch. 259, § 1.

Massachusetts' courts have further articulated the elements that an agreement must contain in order to satisfy the statute as follows: (1) reasonably identify the subject matter of the contract, (2) indicate that a contract with respect to this subject matter has been made between the parties, (3) state with reasonable certainty the essential terms of the unperformed promises in the contract, and (4) be signed by or on behalf of the party to be charged.  <u>DesBrisay v. Foss</u>, 264 Mass. 102, 109 (1928); <u>Harrington v. Fall River Hous. Auth.</u>, 27 Mass. App. Ct. 301, 306 (1989).  Whether a writing satisfies these requirements is a question of law for the court.  <u>Simon v. Simon</u>, 35 Mass. App. Ct. 705, 709 (1994).  When a defendant pleads the Statute of Frauds, the burden shifts to the plaintiff to prove compliance or to prove that the contract in question does not fit within its ambit.  <u>Beaver v. Raytheon Mfg. Co.</u>, 299 Mass. 218, 219 (1938).  Under Massachusetts law, multiple documents, only one of which need be signed, may be read together

as satisfying the Statute of Frauds.  See Blackstone Realty LLC v. FDIC, 244 F.3d 193, 198 n.4 (1st Cir. 2001) (offer letter evidencing sales agreement combined with auction brochure listing the properties satisfied statute of frauds); In re Timothy Bartlett, 367 B.R. 21, 32 (Bkrtcy. Mass. 2007) (cover letter and signed credit application, taken together, evidence the parties' intention to agree on certain terms).

At the outset, it is important to note that the First Circuit has stated that, the "Statute of Frauds is not the tax code." In re Rolfe, 710 F.2d 1, 3 (1st Cir. 1983).  The Court should "always be satisfied with some note or memorandum that is adequate, when considered with the admitted facts, the surrounding circumstances, and all explanatory and corroborative and rebutting evidence, to convince the court that there is no serious possibility of consummating a fraud by enforcement." Id. (quoting 2 A. Corbin, Corbin on Contracts § 498 (1950)).

## 2.    Application of the Statute of Frauds to Reinsurance Contracts

William Hoffman best summarizes the state of the law with regards to the Statute of Frauds in reinsurance contracts:  "There seems to be no common law rule or statute of general application requiring that reinsurance contracts be expressed in writing." William Hoffman, Facultative Reinsurance Contract Formation, Documentation, and Integration, 38 Tort Trial & Ins. Prac. L.J. 763, 796 (2003).  It is not uncommon to form reinsurance contracts via "gentlemen's agreements" concluded with handshakes or written on cocktail napkins, but ultimately "a written confirmation is a commonsense requirement and a prudent and generally prevailing practice in facultative reinsurance." Id.[26]  Given the prevalence of both formal and

---

[26] In the reinsurance context, courts have more often considered the general issue of whether missing terms make a contract unenforceable, quite apart from the statute of frauds.  See Manchester Fire Assur. Co. v. Ins. Co. of Illinois, 1900 WL 3346 (Ill. App. 2 Dist. 1900); Jamaica Pub. Serv. Co. v. Compagnie Transcontinentale De Reassurance, 723 N.Y.S.2d 168 (App. Div. 1st Dept. 2001); AXA Corporate Solutions Ins. Co. v. Lumbermens Mut. Cas. Co., 2007 WL 2013519 (2d Cir. 2007); Am. Eagle Fire Ins. Co. v. Eagle Star Ins. Co., 216 F.2d 176 (9th Cir. 1954).

informal agreements in the reinsurance industry, it is especially critical for this Court to examine the specific facts of this case.

### 3.     Trustmark Insurance Company Case

Defendants rely most heavily on Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am., 424 F.3d 542 (7th Cir. 2005) in support of their argument that the Statute of Frauds bars plaintiffs from enforcing any alleged retrocessional contract here.  The parties in Trustmark jointly investigated the possibility of acquiring a block of reinsurance policies from a third party, and though there was significant discussion of sharing profits, risk, etc., during negotiations, and the defendant reviewed and approved a letter of intent on the sale, in the end only the plaintiff signed the letter.  Trustmark, 424 F.3d at 545.  While the final documents were being drafted, the parties spoke as if the defendant were still part of the deal, with defendant frequently reassuring plaintiff that it remained committed to sharing the risk, until it withdrew before the final acquisition.  Id.

The court found that the Illinois Statute of Frauds, which is essentially identical to the Massachusetts Statute of Frauds, applied to the contract because it could not be performed within one year.  Id. at 549.  Though the court considered whether several different documents bearing defendant's signature could satisfy the memorandum requirement, each was deemed insufficient because they were made while the deal was pending, rather than finalized.  Id. at 549-50 ("At best, all of these writings . . . reveal a reinsurance agreement contemplated, though not

---

Staring suggests that determining what terms are essential is a fact-specific inquiry because cases have come out both ways depending on the circumstances surrounding the contract.  Staring, supra, n. 22, at § 11:2.  In one case, a contract could not be proved because the amount for which the reinsured had insured the property was found to be a missing essential term, Manchester Fire Assur. Co, 1900 WL 3346, at *3, and in another, the exact amount reinsured was allowed to be left out initially because a reasonable estimate and basis for determining the exact figure were included.  AXA Corporate Solutions Ins. Co., 2007 WL 2013519, at *2.

necessarily consummated").  Significantly, the parties failed to agree at any point on essential

terms, including "plaintiff's compensation for administering claims (a figure that would

determine how much premium [the reinsurer] would receive on the back end)."  <u>Id.</u> at 545.  None

of the writings appeared to represent a final agreement.  <u>Id.</u> at 545, 549-50.

### 4.     The Statute of Frauds Writing Requirement is Satisfied

But <u>Trustmark</u> is distinguishable on its facts.  Unlike the documents in <u>Trustmark</u>, none

of the documents reflecting the 19% retrocession here, the behavior of the parties, or their

testimony, remotely suggest that the Contract was still merely a contemplated agreement rather

than a final one:  Swasey's November 9, 1999, letter to D&H concerning the allocation of the

costs among the participants in the Reliance program, which is signed by all parties, and sets

forth IRC Re's 19% participation in the program, Trial Ex. 158; Joseph Cifuni's October 11,

2001, correspondence to AUL RMS demanding payment of sums allegedly due to IRC Re as

retrocessionaire, Trial Ex. 101; and a February 13, 2006, letter, from Jennifer Baird of Beecher

Carlson, to the Insurance Division of the Bermuda Monetary Authority concerning IRC Re's

reporting of losses, Trial Ex. 160.  In the letter, Baird conceded that IRC Re was the

retrocessionaire for certain workers' compensation coverage written by IRC, Inc. and insured by

Reliance. <u>Id.</u>  Swasey ultimately admitted at his deposition that Baird was referring to the

Reliance Compcare 2000 program.  Swasey Dep. 541:3-7.

The Contract also is reflected in the correspondence between Swasey and Pencak in

February 2006.  Swasey's February 23, 2006, memorandum contains the contract's essential

terms: the parties (including Trenwick and MCIC) are identified in paragraph 7a of the

memorandum; the subject matter/risk insured against clearly is the business that is the subject of

the underlying contract between Reliance and Trenwick; and the amount of premium (19%) is

reflected on the attached summary sheet (IRC 00365), as is the duration (each underwriting year

is listed).  Trial Ex. 107.

      **E.**      **There Is Not Enough Evidence to Support a Finding of Fraud or Negligent Misrepresentation Against All Defendants**

Plaintiffs claim that in addition to breaching the Contract and denying its existence in bad

faith, Swasey, IRC, Inc. and IRC Re induced plaintiffs into participating in the Reliance

Compcare 2000 program and paying millions of dollars of premiums to IRC Re with the

knowledge that IRC Re did not intend to fulfill its contractual obligations.  A plaintiff alleging

fraud must show that (1) the defendant falsely represented or omitted a material fact, (2) with

knowledge of the falsity, (3) with the purpose of inducing the plaintiffs to act, and (4) that the

plaintiffs relied upon this representation to their detriment.  See Kilroy v. Barron, 326 Mass. 464,

465 (1950); Sahin v. Sahin, 435 Mass. 396, 402 n. 9 (2001).  In order to make out their fraud

claim, plaintiffs would also need to demonstrate that defendants had an actual intent to deceive.

See, e.g., Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 231 (1st Cir.

2005) (quoting Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996)) (a fraud claim requires

a showing "that [defendants] made the false statement with the intent to deceive").  While many

of the findings of fact suggests that plaintiffs can probably satisfy the first (IRC Re ultimately

breached the Contract despite promising to absorb 19% of the losses on the program), third (both

Abraham and Luc stated that their companies would not have joined the program if IRC Re did

not have "skin in the game"), and fourth (plaintiffs have had to incur the costs of IRC Re's

unpaid balances and portion of the Trenwick/Reliance arbitration settlements as a result of

joining the program and IRC Re's subsequent breach) elements of their fraud claim, there is no

evidence to suggest that Swasey, in his capacity as IRC Re or IRC, Inc., knew that IRC Re ultimately intended to breach the contract *at the time* he invited representatives of Reliance and D&H to participate in the program.

While, as described above, I surely conclude that Swasey is not a trustworthy player or credible witness, the record suggests that he made the initial contract in good faith. First, MCIC participated in the Hanover program without incident; the Reliance program was essentially a continuation of the Hanover program with a new direct insurer. Second, at the time when the alleged fraudulent acts would have to have taken place, the only Trenwick (by way of D&H) representative with whom Swasey dealt, was Dennis Luc. There is no evidence that defendants made representations to Luc that were known to be false or that "concealed true intentions," or that any of the defendants "never had any intention of reimbursing Plaintiffs for losses that would be ceded to MCIC/IRC Re." Compl. ¶ 91.

To be sure, plaintiffs argue that the claim that defendants made false representations with "knowledge of the falsity," can also be satisfied by a "showing that the defendant made a statement with reckless disregard for its truth." Pls.' Post-Trial Br. 30 (quoting Robinson v. Bodoff, 355 F. Supp. 2d 578, 584 (D. Mass. 2005)). But Robinson does not explicitly say that "reckless disregard for truth" can satisfy the "knowledge of the falsity" requirement for a fraud claim. It notes that the former can satisfy the requirement for a *negligent misrepresentation* claim. Robinson, 355 F. Supp. 2d at 584. Nevertheless, I find that there is not enough evidence to show that defendants made a false representations "with knowledge of [their] falsity," under either standard. Thus, plaintiffs' fraud claim fails.

The key difference between fraud and negligent misrepresentation is that negligent misrepresentation "does not require an intent to deceive or actual knowledge that a statement is false." Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 455 Mass. 458, 471 (2009).  In order to prevail even on a negligent misrepresentation claim, plaintiffs must also produce "evidence that the statement was false at the time made, and that the defendant could have learned of the falsity with reasonable care." Rodowicz v. Mass. Mut. Life Ins. Co., 279 F.3d 36, 45 (1st Cir. 2002).  Plaintiffs cannot rely on "[a] simple change of mind by a defendant," in order to establish that an earlier statement was false, but rather, must produce "evidence of the contrary intent" at the time the statement was made.  Id. (quoting McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 709 & n. 4 (1990)).

Again, there is no such evidence here.  What likely happened was that Swasey hoped that the Reliance Compcare 2000 program continued to be successful enough so that IRC Re would not be liable for any significant losses; he did not intend for IRC Re to breach at the outset.  He surely did not anticipate that IRC Re would become insolvent.  It was not a lack of due care that caused him to promise Reliance and D&H that IRC Re would assume the 19% risk when it ultimately could not, but rather, an optimistic outlook on the future of the program and his company.  Therefore, I find that there is not enough evidence to show that the ultimate harm to plaintiffs caused by Swasey and IRC Re's false statements was due to their failure to exercise due care, and thus plaintiffs' negligent misrepresentation claim also fails.

**F.       Piercing the Corporate Veil**

**1.       Massachusetts Law Applies to Plaintiffs' Veil-Piercing Claims**

Plaintiffs argue that because IRC Re does not have sufficient funds to pay the requested damages, and because IRC Re was essentially the alter ego of both Swasey and IRC, Inc., this Court should pierce IRC Re's corporate veil and hold Swasey and IRC, Inc. liable for its obligations.  Pls.' Req. for Findings of Fact ¶¶ 400-402 (document#148); Compl. ¶¶ 116-124. The preliminary question is one of choice of law -- whether the law of Bermuda or Massachusetts should apply to plaintiffs' veil-piercing claims.  Trial Tr. vol. 9, 187:3-4. Plaintiffs argued in their post-trial submissions, and I now find, that because defendants never formally questioned whether Massachusetts law should govern plaintiffs' veil-piercing claims, and because Massachusetts bears a reasonable relationship to the dispute and the parties are not conspiring to avoid any policies of Bermuda that may apply, this Court shall apply Massachusetts law to these claims.

Rule 44.1 of the Fed. R. Civ. Pro. provides, "A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing."  Fed. R. Civ. P. 44.1.  In Carey v. Bah. Cruise Lines, 864 F.2d 201, 206 (1st Cir. 1988), the First Circuit held that "[b]y their silence, the litigants consent to having their dispute resolved according to the law of the forum."  See also Clarkson Co. v. Shaheen, 660 F.2d 506, 512 n.4 (2d Cir. 1981) (parties waive right to the application of any law other than that of the forum by failing to give the requisite notice), cert. denied, 455 U.S. 990 (1982).  The Carey court further stated:

> We concur in general in the judgment of our sister circuits . . . This
> arrangement is not unwelcome from the court's perspective
> because it is spared a complicated international choice-of-law
> problem and can apply law with which it is more familiar.  We do

not see any harm in a court deferring to the litigants in these circumstances.

We add, however, the following caveats. Deference is appropriate provided that (a) the forum state bears a reasonable relationship to the dispute, and (b) the litigants are not conspiring to avoid the policies of any other sovereign whose laws might otherwise apply to the dispute.

864 F.2d at 206.

In the instant case, defendants never gave written notice that they would seek the application of Bermuda law to plaintiffs' veil-piercing claims. In fact, in defendants' February 4, 2008, motion to dismiss, they sought dismissal of each count of plaintiffs' complaint on the ground that it failed to state a claim under *Massachusetts* law. Other circuits have suggested that notice of the applicability of foreign law should, at the latest, be given at the pretrial conference. See DP Aviation v. Smiths Indus. Aerospace & Def. Sys., 268 F.3d 829, 847-48 (9th Cir. 2001). In contrast, plaintiffs have relied on Massachusetts corporate veil law throughout the course of this litigation, including in their motion to compel discovery, their motion for default judgment, their renewed motion for default judgment, and their motion in limine to determine adverse inferences.

As such, the Court applies the law of the forum state rather than engaging in a complex choice-of-law analysis. See Carey, 864 F.2d at 206.[27]

---

[27] Application of forum law is appropriate under Carey because there is no evidence indicating that the parties have conspired to avoid the policies of Bermuda law, and Massachusetts bears a reasonable relationship to the dispute because IRC, Inc. and Swasey reside in Massachusetts.

### 2. There Is Not Enough Evidence to Support a Finding of Piercing the Corporate Veil

The controlling precedent on piercing the corporate veil in Massachusetts, <u>My Bread Baking Co. v. Cumberland Farms, Inc.</u>, 353 Mass. 614 (1968), permits a court to disregard the separateness of legal entities only "in rare . . . situations" where it is necessary to "prevent gross inequity," and when there is evidence of (1) a "fraudulent or injurious consequence of the intercorporate relationship" or (2) a "confused intermingling of activity . . . with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting." 353 Mass. at 619. Plaintiffs have not alleged any fraud or injury *as a result* of the intercorporate relationship, but rather, have rested their allegations on the second prong of <u>My Bread</u>, "confused intermingling." Despite their general allegations, "plaintiffs have [not] alleged that *they* were confused about the identity of the legal entity with which they were contracting." <u>Platten v. H.G. Berm. Exempt Ltd.</u>, 437 F.3d 118, 129 (1st Cir. 2006). <u>Platten</u> holds that veil-piercing is not appropriate when "[p]laintiffs were never misled about which corporate entity . . . was obligated to them or was dealing with them." <u>Id.</u> (quoting <u>My Bread</u>, 353 Mass. 614); <u>see also</u> <u>Birbara v. Locke</u>, 99 F.3d 1233, 1240 (1st Cir. 1996) (declining to pierce the corporate veil where there was insufficient evidence that they were not misled about the relationship between corporate entities); <u>George Hyman Constr. Co. v. Gateman</u>, 16 F. Supp. 2d 129, 151-52 (D. Mass. 1998) (declining to pierce veil where "[t]he salient fact is that [plaintiff] was not confused at all about the intercorporate relationship"). Indeed, plaintiffs have alleged throughout these proceedings that there was a contract with MCIC/IRC Re; they have never alleged that the contract was with IRC, Inc. or Swasey himself. More importantly, there is no testimony from

Abraham of Reliance, Luc of D&H, or Pencack of AUL RMS, indicating that they believed the Contract to be with an entity other than IRC Re, or that IRC, Inc. would ultimately be liable for IRC Re's risk in the program.  See, e.g., Trial Tr. vol. 2, 112:11-114:6. **End here**

The First Circuit suggests that a lack of confusion on the part of the other contracting parties precludes veil-piercing.  Nevertheless, I will briefly address plaintiffs' application of the remaining factors that a court generally considers when deciding whether to pierce the corporate veil.  See Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F. 2d 10, 16 (1st Cir. 1985).  Although the Pepsi Cola factors "are to be weighed, not counted," and there are no "minimum number of factors" that must be met, see Jordan L. Shapiro, Marc G. Perlin & John M. Connors, 48 Mass. Prac. Collection Law § 12:19 (3d ed.), I have found that there are certain factors that Massachusetts courts usually find important, specifically -- "confused intermingling of business assets or management" and "siphoning away of corporate assets by dominant shareholder."  Plaintiffs cannot satisfy those factors on this record.  See Pepsi-Cola, 754 F. 2d at 14; Att'y Gen. v. M.C.K., Inc., 432 Mass. 546, 556-57 (2000).

Indeed, it is because of the difficulty of proof that the plaintiffs have dedicated numerous pages to argue that the Court should adopt certain adverse inferences proposed in plaintiffs' April 28, 2010, motion in limine.  That motion identifies inferences to which plaintiffs claim they are entitled under Judge Young's March 19, 2009, Sanctions Order.  I appreciate plaintiffs' frustration over defendants' actions during discovery, as described below, and acknowledge that because Judge Young's order specifically states that "[d]efendants shall fully comply with the Court's prior order within 14 days of the date of this order as to all data within their custody and control upon pain of the Court drawing an adverse inference against them," plaintiffs may be

entitled to *some* adverse inferences; the inferences plaintiffs seek are inappropriate. Specifically, they ask the Court to infer from defendants' failure to produce banking records and other financial documents that "the assets of IRC Re were commingled with the assets of Swasey and IRC, Inc.," Proposed Adverse Inference No. 7, Pls.' Post-Trial Br. 61, and that "Swasey and IRC, Inc. caused assets of IRC Re to be transferred to Swasey or IRC, Inc. for the benefit of Swasey and/or entities in which Swasey had a financial interest." Proposed Adverse Inference No. 8, Pls.' Post-Trial Br. 61. I will not draw that inference here. Plaintiffs have requested bank records going back as many as fourteen years. See Trial Exs. 242-43, 245-46. They were all supposedly kept, not by Swasey or IRC, Inc., but by IRC Re's manager, Beecher Carlson, in Bermuda. Trial Tr. vol. 8, 116:10-12. Since Swasey was not the records' custodian, and since in other respects the corporate form was respected, id. at 117:19-118:3, I will not pierce IRC Re's corporate veil so that the obligations of defendant IRC Re may be imposed on Swasey and IRC.

### G. Chapter 93A Liability

Massachusetts General Laws c. 93A, § 2(a) sets out the basic liability standards of Chapter 93A: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Mass. Gen. Laws Ann. ch. 93A, § 2(a). To be sure, Massachusetts courts "have declined to adopt a static definition of either 'unfair' or 'deceptive.'" See Purity Supreme, Inc. v. Att'y Gen., 380 Mass. 762, 776 (1980). Causes of action under Chapter 93A are "notoriously amorphous, and not necessarily tied to common law rights of action." Speakman v. Allmerica Fin. Life Ins. & Annuity Co., 367 F. Supp. 2d 122, 142 (D. Mass. 2005). It is well settled that "conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an

unfair act or practice" under Chapter 93A. <u>Arthur D. Little, Inc. v. Dooyang Corp.</u>, 147 F.3d 47, 55 (1st Cir. 1998) (quoting <u>Anthony's Pier Four v. HBC Assocs.</u>, 411 Mass. 451, 474 (1991)); <u>see also</u> <u>Seven Provinces</u>, 9 F. Supp. 2d at 68 ("Chapter 93A allows one business to sue another over conduct that is 'unfair,' Mass. Gen. L. ch. 93A §§ 2(a), 11, including acts that are associated with the breach of a contract"). While a breach of contract is not, on its own, sufficient to constitute a Chapter 93A violation, a breach of the implied covenant of good faith and fair dealing may be an unfair or deceptive practice under the statute. <u>Speakman</u>, 367 F. Supp. 2d at 140. Moreover, in the reinsurance context, egregious misconduct that violates the duty of utmost good faith, goes beyond an ordinary breach of contract and may also give rise to liability under Chapter 93A. <u>Seven Provinces</u>, 217 F.3d at 43-44. Finally, while there is considerable debate about whether litigation tactics alone can rise to the level of a Chapter 93A violation, there is little doubt that a course of conduct beginning *before* litigation and continuing unabated, thereafter may do so. See <u>e.g.</u> <u>Commercial Union Ins. Co. v. Seven Provinces</u>, 217 F. 2d at 41 n. 5.

While the three defendants stand in different postures with respect to Chapter 93A, all participated in the culpable conduct. First, I find that IRC Re and its principal officer, Swasey, disavowed the Contract in bad faith, raised a specious defense, strung the plaintiffs along, pre- and post-litigation, all in a bad faith effort to avoid payment. Second, I find that Swasey exacerbated the situation by using IRC, Inc. to buttress IRC Re's arguments that there was no contract, that there was only an agreement to agree, that the absence of a formal written agreement was dispositive. With IRC, Inc., the program's manager, and IRC Re, the program's reinsurer, aligned on the same side, not surprisingly, *Swasey's* side, there was little chance of

resolving the claim in a timely fashion and surely without litigation. And when the litigation started, the defendants did everything they could to obfuscate the issues and stall their ultimate resolution. [28]

### 1. IRC Re

Defendant IRC Re plainly lacked a good faith basis to dispute the existence of the Contract that it each repeatedly acknowledged through its own documents, its dealings with all of the participants in the Reliance program, outside auditors and governmental agencies, and significantly, in its receipt of millions of dollars in premiums. Indeed, IRC Re's position that there was merely an agreement to agree was nothing short of a sham, contrived at the eleventh hour to avoid paying. This is more than the ordinary breach of contract. IRC Re's agent, Swasey, was the architect of the entire arrangement. As I noted above, the witnesses who testified on the behalf of the plaintiffs -- even those without an interest in the outcome – were positively indignant that IRC Re and Swasey had the temerity to claim "no contract." I share that indignation. As such, I find that IRC Re violated Chapter 93A.

### 2. Malcolm Swasey

As I noted at the outset, Swasey's fingerprints are all over this case -- the formation of the Reliance program, the company that administered it, the company that reinsured it. *His* acts cannot be disentangled from IRC Re. I find Swasey personally liable for the bad faith acts committed by IRC Re in violation of 93A. Corporate officers may be held liable under Chapter

---

[28] A word about the difference between piercing the corporate veil of IRC Re, and this Chapter 93A finding: Central to the "veil-piercing" analysis is my finding about what *the parties knew* about the corporate relationships. The parties contracting with the defendants were well aware of the relationships among them. Everyone understood and accepted Swasey's relationships with IRC Re, on the one hand, and IRC, Inc., on the other. The Chapter 93A analysis, however, hinges on each defendant's individual *conduct*, with Swasey as the fulcrum, authorizing IRC Re to deny the claim and manipulating IRC, Inc. to support the specious denial.

93A for participating in unfair or deceptive practices of their corporations. See Nader v. Citron, 372 Mass. 96, 102-03 (1977); see also Bolen v. Paragon Plastics, Inc., 754 F. Supp. 221, 228 (D. Mass. 1990) (corporate officer who allegedly misrepresented that salesman would be compensated if company sold customer account may be liable under ch. 93A); Cmty. Builders v. Indian Motocycle Assocs., 44 Mass. App. Ct. 537, 560 (1998) (officers liable under 93A for their personal participation in orchestrating corporate defendant's violation of the covenant of good faith and fair dealing and its pattern of unfair and coercive conduct aimed at pressuring plaintiff to reduce its claim); Standard Register Co. v. Bolton-Emerson, Inc., 38 Mass. App. Ct. 545, 550 (1995) (affirming judgment against seller and its corporate officers under 93A even though officers were acting within the scope of their authority where officers fraudulently induced the plaintiff purchaser into entering into contract and to refrain from terminating it); Marshall v. Stratus Pharmas., Inc., 51 Mass. App. Ct. 667, 677 (2001) (Chapter 93A claim lies against corporate officers who induced plaintiff into entering into contract with no intention to pay for plaintiff's services).

Since it was *Swasey* who assured Reliance and D&H that IRC Re would be taking on 19% of the risk in the Compcare 2000 program, Abraham Dep. 15:5-15; Luc Dep. 44:11-13, 44:17-24, and it was *Swasey* who set up and renewed the Contract each year, and it was *Swasey* who negotiated with Pencack about the amounts due until he directed Baird to stop any further communication, Trial Ex. 92; Swasey Dep. 437:3-6, I find that he is individually liable for the bad faith disavowal of the IRC Re contract under Chapter 93A. In addition, Swasey's pre-litigation conduct was compounded by his post-litigation antics, misrepresentations during his deposition, and even during his testimony.

### 3.    IRC, Inc.

Plaintiffs allege that IRC, Inc. is also liable under 93A because IRC, Inc. engaged in: (1) fraud and misrepresentation; (2) bad faith disavowal of the retrocessional contract between IRC Re and Trenwick/UNUM; and (3) "egregious" post-litigation misconduct. Pls.' Post-Trial Br. 34-43.  While I found that neither IRC, Inc. nor Swasey is liable for fraud or negligent misrepresentation, there can be no liability under 93A relative to those allegations, but there are ample other grounds for IRC, Inc.'s 93A liability.

Although disavowing a "known contractual arrangement" in bad faith in order to secure benefits for the breaching party, constitutes an unfair act or practice under 93A, <u>Dooyang Corp.</u>, 147 F.3d at 55 (quoting <u>Anthony's Pier Four</u>, 411 Mass. at 474 (1991)), the principle is complicated here because IRC, Inc. is not a party to the Contract that was breached. Nevertheless, it was a central player in the arrangement; its support of IRC Re's position made possible the sham.  It was program manager and intermediary for the Reliance Compare 2000 program, IRC Inc. and as such -- through Swasey -- was fully aware of the 19% retrocession agreement between IRC Re and Trenwick/UNUM.  IRC, Inc. It benefitted substantially from its participation in the program.  It received a management commission of 23% of the gross written premium received by Reliance.  Trial Exh. 84, 106, or 9, 730, 246.  Since IRC Re's participation as a reinsurer was critical to the participation of the other parties, IRC Re's role allowed IRC, Inc. to earn over nine million dollars.

When IRC Re disavowed the contract, IRC, Inc., through Swasey, followed in lockstep, supporting a position that was untenable and in extreme bad faith.  During the Pencak negotiations, Swasey relied on the records of both IRC, Inc. and IRC Re and his position that

there was "only" an agreement to agree, likewise depended on his control of both entities. Indeed, it is difficult if not impossible to disentangle Swasey's role in IRC, Inc. from his role in IRC Re. If they were different entities, outside of Swasey's control, it would not be unreasonable to suppose IRC, Inc. would have been aligned with the parade of plaintiffs' witnesses who, when asked, "Was there a contract?" said, "Of course!"

In addition, I will consider the litigation tactics of the defendants, insofar as those tactics continued the course of contact that had begun pre-litigation, the wholly bad faith disavowal of these contractual relationship. While there may be debate concerning whether litigation tactics alone can comprise a Chapter 93A violation, there is no debate concerning whether such tactics can be considered along with egregious, bad faith pre-litigation conduct.

There are cases in which the court has held that bringing a frivolous lawsuit can constitute a 93A violation. City of Revere v. Bos./Logan Airport Assoc's, LLC, 416 F.Supp.2d 200, 211 (D. Mass. 2005) (finding a 93A violation by commencing "clearly meritless litigation.") And there are cases in which a court has held that post litigation conduct continues a course of conduct which amounts to a 93A violation. In Seven Provinces, for example, the First Circuit noted: "It is settled law that conduct during litigation can constitute a 93A violation." 217 F.3d at 41 n. 5 (quoting Schubach v. Household Fin. Corp., 375 Mass. 133, 135-36 (1978)); see also Refuse & Envtl. Sys., Inc. v. Indus. Servs. of Am., Inc., 932 F.2d 37, 43 (1st Cir. 1991) (stating that "bringing [a] lawsuit in spite of the evidence" can be a 93A violation). While one might read "conduct during litigation" to encompass more than just the initial filing of a frivolous suit,

the actual conduct found objectionable under 93A in <u>Seven Provinces</u>, began *before* the filing of

the suit and continued throughout the litigation.  <u>Seven Provinces</u>, 9 F. Supp. 2d at 49, 51.[29]

       To be sure, IRC, Inc. did not file a frivolous suit, or any suit for that matter.  It merely

defended but it used many of the same tactics in defense that it had used pre-litigation.  Indeed,

plaintiffs do a convincing job of reviewing the evidence in the record of defendants' (including

IRC, Inc.'s) shifting positions throughout this litigation, most significantly on the existence of the

19% retrocessional to IRC Re, the shifting positions and discovery abuses (on which Judge

Young relied in his orders of March 19, 2009, and June 10, 2009.)  For example, Swasey signed

interrogatory answers on behalf of all defendants in which he denied that any reinsurance

structure exists with regard to the Reliance Compcare 2000 program. (Defendants' Answer to

Interrogatory No. 9). He testified at his deposition, in which he appeared individually and as the

sole Rule 30(b)(6) designee for *both* IRC Re and IRC, Inc. as to all matters, that IRC Re had no

relationship, contractual or otherwise, with the Reliance Compcare 2000 program. (Swasey Tr. at

183:23-184:14).  IRC, Inc., through Swasey, was fully aware that it was not participating in a

good faith contract dispute, but rather was using its status as program manager and reinsurance

intermediary in an effort to frustrate plaintiffs' contractual rights.  Like IRC Re, it carried out

defendants' moving target strategy of shifting positions, adopting the positions of its

_____

[29] In addition, in the two cases cited by the First Circuit in its <u>Seven Provinces</u> decision, the conduct for which the defendants were ultimately found liable under 93A was the commencement of the suit, rather than anything that took place after that. <u>Schubach</u>, 375 Mass. at 136-37; <u>Refuse & Envtl. Sys., Inc.</u>, 932 F.2d at 43.  For example, in <u>Schubach</u>, where plaintiffs claimed that defendants "unfairly" (under the 93A definition of the term) filed a collection action against them in an inconvenient location, part of the "unfairness" was having to incur expenses for long-distance phone calls with their attorneys, as well as traveling to see their attorneys, while defending the action. 375 Mass. at 134.  While plaintiffs argued that the call and travel expenses, which occurred *during* the litigation, evidenced the unfairness of their having to defend the suit, the court only considered and ultimately decided that the filing of the suit in an inconvenient location itself provided sufficient grounds to uphold the lower court's denial of defendant's motion to dismiss. <u>Id.</u> at 135-36.

co-defendants, retaining the same lawyer, relying upon the same pleadings, and designating the same 30(b)(6) witness, Swasey.

Plaintiffs rely on <u>Seven Provinces</u> in support of their assertion that post-litigation misconduct, and in particular a "moving target" strategy, can constitute a violation of 93A. Specifically, a "moving target" strategy, according to <u>Seven Provinces</u>, represented an attempt to evade payment of reinsurance obligations and as such, constituted a Chapter 93A violation.[30]  9 F. Supp. 2d at 69.  To be sure, in <u>Seven Provinces</u>, the only defendant found liable under 93A was the party with which the plaintiff actually had the contract.  But in this case, IRC, Inc.'s participation in the contract's evasion cannot be disentangled from Swasey's and IRC Re's.

Plaintiffs also rely on <u>Speakman</u> in support of their argument that the Court can find IRC, Inc. liable under Chapter 93A without piercing the corporate veil.  In <u>Speakman</u>, the plaintiff insurance agents agreed to repay past commissions on certain variable annuities issued by the defendant insurer in return for a stream of future, potentially higher, "trail" commissions on the annuities. 367 F. Supp. 2d at 125.  The plaintiffs financed their payment obligations to the insurer by signing 10-year notes.  <u>Id.</u>  About two years later, the insurer stopped accepting applications for new annuities and severely curtailed the services it provided to existing accounts, destroying most of the potential value of the trail commissions. <u>Id.</u>  After the insurer refused to cancel the plaintiffs' loan obligations or to reimburse them for their losses, the plaintiffs sued the insurer and two of its corporate affiliates.  <u>Id.</u>  The complaint asserted a claim

───────────────

[30] Not only was the 93A finding limited to Seven Provinces's shifting position with regards to withholding  payments it owed under the contract, but the opinion cited specific language from the Massachusetts Appeals Court describing exactly how withholding payment on a contract in order to renegotiate terms constitutes a 93A violation. <u>Seven Provinces</u>, 9 F. Supp. 2d at 68-69 (quoting <u>Atkinson v. Rosenthal</u>, 33 Mass. App. Ct. 219, 226 (1992) ("the use of a breach of contract as a lever to obtain advantage for the party committing the breach in relation to the other party; i.e., the breach of contract has an extortionate quality that forgives it the rancid flavor of unfairness.")).

against the insurer for breach of the implied covenant of good faith and fair dealing and against all defendants for violations of Chapter 93A. <u>Id.</u>  The court rejected defendants' argument that the complaint failed to state a claim against the affiliates, who were not in privity with the plaintiffs, finding that one or both of them played an active role in the complained of conduct. <u>Id.</u> at 142-43.

Likewise, plaintiffs argue that Swasey *and* IRC, Inc. played an active role in the misconduct giving rise to their claims under Chapter 93A both because they deliberately induced Trenwick and Reliance to join the program with the promise of IRC Re's participation purely for their personal gain, and then stood by when Swasey, now acting under IRC Re's hat, wrongly disavowed that participation.

In addition, in <u>Speakman</u>, the affiliated corporations that the court found liable, despite not having strict contractual privity with the plaintiffs, were parent corporations of the defendant that was a party to the contract. 367 F. Supp. 2d at 125-26.  All of the corporations were ultimately working towards the same goal; the parent corporations clearly and directly benefitted from the profitable actions of its subsidiaries,: Here, IRC, Inc.'s interests, while not identical to those of IRC Re, were clearly coincident, working towards the same goal -- enriching Swasey.

IRC, Inc.'s joining in the disavowal of the retrocessional contract between IRC Re and Trenwick/UNUM before and during the litigation plainly justifies finding IRC, Inc. independently liable under Chapter 93A.

## IV.    DAMAGES

At trial, plaintiffs presented Trial Ex. 240, which showed their calculation of the outstanding balances due relative to the contract between IRC Re and Trenwick as

$4,182,055.32. Trial Ex. 240, at TREN 13683. Art Coleman ("Coleman"), the President of

Citadel,[31] created this document and described his process during his trial testimony. He first

performed a reconciliation of all of the Reliance accounts in order to summarize and verify the

accuracy of the payments and billings to IRC Re. Trial Ex. 238; Trial Tr. vol. 6, 16:25-17:3. He

did this by creating a "spreadsheet type database," which listed each and every premium and loss

account from Reliance, by time period, and then derived the amounts ceded to IRC Re for its

19% share. Trial Tr. vol. 6, 17:5-14. As Coleman continued to receive accounts from Reliance,

he continued to update the reconciliation summary, and Exhibit 240 represents the most updated

copy of the reconciliation summary. Trial Tr. vol. 6, 30:8-20. Defendants have submitted no

evidence to contradict Coleman's reconciliation or to challenge the accuracy of the

reconciliation, and in fact, said they had "no objection" to Exhibit 240, formerly MMM, at trial.

Trial Tr. vol. 6, 31:4-6.[32]

Pencak was responsible for providing the final value of the Reliance-Trenwick settlement

to Coleman so that it could be reflected in the reconciliation. Trial Tr. vol. 2, 84:16-22. Pencak

prepared a spreadsheet that outlined the credit reduction to be applied, resulting from the

settlement of the Reliance-Trenwick arbitration. Trial Ex. 217; Trial Tr. vol. 2, 84:23-85:18.

Coleman incorporated the settlement reduction credited to IRC Re into his reconciliation. Trial

Ex. 238; Trial Tr. vol. 2, 86:6-8; Trial Tr. vol. 6, 28:9-21. The allocation to IRC Re is reflected

in the column called "ITD Adj. Acct." Trial Ex. 238, at TREN 08678; Trial Tr. vol. 6, 28:9-21.

Coleman explained that as of December 2006, before ceding to IRC Re, a 5% discount off of the

---

[31] Citadel Risk Management is a full service reinsurance consultant, Trial Tr. vol. 6, 13:20-23, and is the "accounting manager" for AUL RMS. Id. at 13:24-14:6.

[32] Cf. Trial Tr. vol. 2, 85:19-86:1 (defendants withdrew objection to Trial Ex. 217).

Reliance numbers was applied, because due to the settlement, it was necessary for future billings to be booked with a 5% reduction. Trial Tr. vol. 6, 29:13-16. Trenwick initially paid the expenses related to the Reliance-Trenwick arbitration and then remitted billings to AUL RMS for collection from the retrocedents on the program. Trial Tr. vol. 2, 87:18-23. Pencak went through each billing and determined what was related to the Reliance Compcare 2000 program business and what was not. Id. at 88:4-17, 89:2-13; Trial Ex. 210. Pencak allocated the expenses attributable to the Reliance-Trenwick arbitration to the individual SARF members and MCIC, according to their percentages of participation in the program. Trial Tr. vol. 2, 89:2-13, 89:22-90:3; Trial Ex. 211. A total of $90,964 was allocated to MCIC. Trial Tr. vol. 2, 90:21-91:5; Trial Ex. 211. This legal expense allocation billing appears on Coleman's reconciliation in the December 2008 column. Trial Ex. 240, at TREN 13683; Trial Tr. vol. 6, 32:5-19. Defendants presented no evidence challenging the accuracy of this legal expense allocation.

Trenwick's reinsurance contract with Reliance was ultimately commuted.[33] Trial Tr. vol. 2, 91:8-10; Trial Ex. 213. The commutation was billed by AUL RMS and was allocated between Trenwick, the individual SARF members and MCIC according to their percentages of participation in the Reliance Compcare 2000 program. Trial Tr. vol. 2, 95:13-17. IRC Re's $1,028,302.44 share of the commutation appears on Coleman's reconciliation in the "commutation A/C" column. Trial Ex. 240, at TREN 13683. Defendants presented no evidence contesting this amount. The Court finds that the balance due from IRC Re is $4,182,055.32. Id.

Plaintiffs have also claimed that they are entitled to pre-judgment interest on each retrocessional billing at a rate of 12%, the statutory rate, from sixty days after it was sent to IRC

---

[33] A commutation is a "final extinguishing of all future liabilities." Trial Tr. vol. 2, 91:11-12.

Re.  Coleman prepared an interest calculation by applying 12% interest to each retrocessional billing from sixty days after it was sent to IRC Re.  Trial Tr. vol. 6, 34:7-25.  The Court finds it excessive to award interest going back as many as fourteen years, when AUL RMS did not aggressively try to collect outstanding balances from IRC Re until 2006.  Thus, the Court awards 12% interest from the commencement of this suit, which is approximately $1.9 million in interest  owed by IRC Re to plaintiffs.

I find that the acts described above are wilful and knowing.  As such, plaintiffs are entitled to an award of double damages against IRC Re, IRC, Inc., and Swasey[34] along with attorneys' fees and expenses in an amount to be determined by the Court upon plaintiffs' submission of an affidavit of services rendered on notice to counsel for defendants, and costs of suit.  The measure of damages to be doubled is the amount owed by IRC Re, plus interest.

The plaintiffs are to submit a form of order, and an application for attorneys' fees and expenses by **February 23, 2011**.  The defendants are to respond by **March 10, 2011.**

**SO ORDERED.**

**Date:  February 16, 2011**          /s/ Nancy Gertner
                                        **NANCY GERTNER, U.S.D.J.**

---

[34] Section 11 of Chapter 93A provides that if the court finds for the plaintiff, "recovery shall be in the amount of actual damages; or up to three, but no less than two, times such amount if the court finds that the . . . act or practice was a willful or knowing violation" of . . . section two. M.G.L.A. ch. 93A, § 11.